JULIA LAWRENCE. The (UNITED STATES v.). See Case No. 15,502.

## Case No. 7,579.

### The JULIA M. HALLOCK.

[1 Spr. 539; [1] 14 Law Rep. 555.]

District Court, D. Massachusetts. Jan., 1852.

COLLISION—ANCHORED VESSEL—EFFECT OF HAVING PILOT ON BOARD — ANCHORING TO LEEWARD—IMPROPER GETTING UNDER WAY.

1. In case of collision, the owners of the vessel in fault are not exonerated from liability, by having a pilot on board.

[Cited in The China v. Walsh, 7 Wall. (74 U. S.) 70; Homer Ramsdell Transp. Co. v. Compagnie Generale Transatlantique, 63 Fed. 853.]

2. Anchoring directly to leeward of another vessel, at the distance of 125 to 150 fathoms, is not, of itself, negligence.

[Cited in The Lincoln, Case No. 8,354; The Mary Fraser, 26 Fed. 873.]

3. A schooner, in getting under way, ran foul of a vessel at anchor: Held, that the schooner was prima facie liable.

[Cited in The Lady Franklin, Case No. 7,984.]

4. A windward vessel, short-handed, and further assistance expected, hove short, before making sail, the anchor having previously dragged: Held, that this was an improper mode of getting under way.

This was a cause of collision. The libel alleged that, on the 25th of October, 1851, the libellants' barque Mary, of about 200 tons burden, was lying in Holmes' Hole, and at about 7 or 8 o'clock, a. m., the wind blowing quite fresh from west south-west, the crew were beginning to get her under way, when they perceived the Julia M. Hallock, (a schooner of about 300 tons,) drifting rapidly toward them; that the first mate hailed the schooner, to throw over her starboard anchor, but the hail was not obeyed or answered, and the schooner continued to drift, and came afoul of the barque, and caused certain damage, which was specified. The libel alleged want of due care on the part of said schooner. The answer admitted the allegations of the libel, as to time, place, and wind, but denied all negligence and want of skill, and alleged that the schooner was getting under way in the usual manner, and struck adrift, without any fault on the part of master, or crew, or pilot. It appeared that the schooner was laden with a full cargo of cotton and staves on deck and under deck; that she went into Holmes' Hole for a harbor, on the afternoon of the 24th; that, in order to anchor her, the crew attempted to throw over the best bower, but that it caught in some part of the rigging. They then threw over the larboard anchor, which did not hold the vessel, and they were obliged to clear away and throw over the best bower, to bring her up. The barque came in at about 4, a. m., and came to anchor from 125 to 150 fathoms dead to leeward of the schooner. The other facts were generally undisputed, and appear in the decision of the court. The chief dispute was, as to the proper mode

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

of getting under way, in a fore-and-aft schooner, with fresh wind, and a vessel under the schooner's lee. Many experts were examined on this point.

The libellants contended that the schooner was primâ facie answerable, and that she must show that care and skill could not have prevented the collision; and insisted that there was, in fact, a want of care and skill.

The respondents contended that the schooner was got under way in the usual manner, and that they were bound only to the exercise of ordinary skill; and also, that the barque did wrong in coming to anchor under the lee of the schooner.

W. Sohier and J. Lowell, for libellants.
B. Rand and A. H. Fiske, for claimants.

SPRAGUE, District Judge. The libellants' vessel having, while at anchor in a harbor, been run foul of by the schooner, when the weather was not so heavy that she could not ride safely at her anchors, the schooner is prima facie liable. The explanation given is that. having taken a pilot, she was getting under way in the usual manner. She took up her large anchor, and had heaved in to the fifteen fathom shackle of the smaller chain, when the vessel got loose and drove into the barque.

Much stress is laid on the fact that a pilot was on board. This is not, in itself, a good defence. It only goes to show care on the part of the owners. If the defendants chose a prudent and skilful master, and a prudent and skilful pilot, they have certainly done all that they could personally do to insure the safety of their vessel, and its proper management. But if that prudent master, or pilot, behave imprudently or unskilfully, in the particular instance, the defendants will be answerable, unless exonerated by virtue of some statute.

Let us see, then, whether the defendants' agent exercised that ordinary care and skill which the law requires. It is said that the schooner was got under way in the usual manner. In determining what is usual, we must look to the circumstances. One important circumstance is, that the schooner's small anchor, when let go the night before, had dragged, so that they were obliged to let the large one go.

Another material fact is, that the schooner was unquestionably short-handed; the mate and one man were sick below, and the cook had been so, and although about the deck, took no part in the active work of the vessel. The master, knowing all this, went ashore, leaving orders to get up the large anchor. This was injudicious.—so say the experts; and, independently of their testimony, I should not hesitate to pronounce the master's conduct imprudent.

The master then comes on board with the pilot. The latter, not knowing that the vessel had dragged the night before, gives the order to heave short. The captain ought to have told the pilot that the anchor had failed before; that with a larger scope, it had dragged. There was no immediate necessity of heaving short. The pilot's boat had gone ashore for two hands. I suppose they intended to wait for these men. Why heave short before they came?

If those two men had been on board, and the vessel had struck adrift, as she did, it is probable that the collision would not have happened. Those men could have got up a jib, as the testimony says, in two or three minutes, and the schooner could have been sheered off. Then, as to getting sail on her, the evidence proves that the proper mode of getting a fore-and-aft schooner under way, where there is a vessel or a shore under her lee, is to get up sail, the mainsail at least, before heaving short. I think, therefore, the schooner was to blame.

The only remaining question is, whether the barque was also in fault. It is contended that she took a dangerous position. She anchored to leeward of the schooner, distant from 125 to 150 fathoms. The weight of evidence is, that it was a proper position. One witness gives a reason for thinking it proper to anchor to leeward, for there is no dispute that the distance was ample. He says, that the great danger of drifting, arises upon a change of wind; and of course, on a change of wind, the relative position of the vessels would be altered, and the windward vessel would not drift in the direction of the other.

On the whole, I think the schooner alone is in fault. The amount of damages is to be settled by an assessor, unless the parties can agree.

NOTE. The cases relating to the responsibility of other parties for the torts or negligence of pilots, are: 1st. Actions against the master. 2d. Actions against the ship or owners. And these, again, are cases, 1st. Where the pilot, (whether licensed or not,) was employed by the master, at his option. 2d. Where the pilot was in the constant employ of the owners, as an officer. 3d. Where the ship was compelled to take the pilot, by a statute enforced by a penalty. 4th. Where the statute, in terms, exonerated the master and owners from liability for the pilot's acts, or negligence.

In actions against the master, it is a good defence, that the pilot was rightfully employed, and was in the exclusive control of the ship. For the time, he is substituted in the master's place. Smith v. The Creole [Case No. 13,033]; Yates v. Brown, 8 Pick. 23; 3 Kent. Comm. 176; The Portsmouth, 6 C. Rob. Adm. 317, note; Pollok v. McAlpin, 7 Moore, P. C. 427. See, however, Story. Ag. § 456a. The master and crew are still responsible for the performance of their duty. The Diana. 1 W. Rob. Adm. 136; The Massachusetts, Id. 371; The Lochlibo. 7 Moore, P. C. 427.

When the pilot is the servant of the owners, in their constant employ, as an officer of the vessel, the question would seem to be: Who is in command? In Denison v. Seymour. 9 Wend. 10. which was a case of collision, the court sustained a verdict against the master, though the regular pilot of the colliding steamer was at the helm at the time. In Snell v. Rich. 1 Johns. 305, the court held that the master was

not liable for damage done by the negligence of a branch pilot, he being in charge of the colliding ship, and the master on shore, when the damage was done. So in Bowcher v. Noidstrom, 1 Taunt. 568, where the pilot was in charge, and the master asleep, at the time of the collision.

These actions, (as well as those of Bennet v. Moita, 7 Taunt. 258, and Ritchie v. Bowsfield, Id. 309, which were decided under the English pilot act,) sounded in tort. This defence does not seem to have been taken to any action, brought by the shipper of the cargo, against the master, upon his contract as a carrier. In actions against a ship, or owners, by the maritime law, "the parties who suffer are entitled to have their remedy against the vessel that occasioned the damage, and are not under the necessity of looking to the pilot, from whom redress is not always to be had, for compensation. The owners are responsible to the injured party, for the acts of the pilot; and they must be left to recover the amount, as well as they can, against him." The Neptune the Second, 1 Dod. 467; 3 Kent, Comm. 135; 1 Bell, Comm. 583; The Lord John Russell, Stu. Adm. 197; The Cumberland, Id. 75. But, in England, the maritime law has been changed by numerous statutes, general or local, in obedience to which, all the reported cases, since the year 1812, have been determined. See the pilot acts, 52 Geo. III. c. 39; 6 Geo. IV. c. 125; 17 & 18 Vict. c. 104, § 388. By the second of these statutes, the owners and master are exonerated from being answerable for any loss or damage arising by means of any "neglect, default, incompetency, or incapacity of any licensed pilot," in charge of a ship, "in pursuance of any of the provisions of this act." And it has been decided, that where the pilot was not taken on board under the provisions of this act, but of the Newcastle pilot act, 41 Geo. III. c. 86, which provided that vessels coming into, or departing from Newcastle, "are hereby obliged and required" to receive licensed pilots; and in case of neglect or refusal, shall pay to the "pilots and seamen, the aforesaid pilotage duties;" the ship was entitled to the same exemption, because the pilot was taken by compulsion; and that either the words "obliged and required," or the making neglect to take a pilot punishable by payment of the pilotage duties, operate as such compulsion. The Maria, 1 W. Rob. Adm. 95; The Protector, Id. 47; The Atlas, 2 W. Rob. Adm. 502; Smith v. Condry, 1 How. [42 U. S.] 28; Carruthers v. Sydebotham, 4 Maule & S. 77. So with the Liverpool pilotage act, 37 Geo. III. c. 78, which provided, that a ship neglecting to take a pilot, should pay full pilotage. The Maria, ubi supra; and 5 Geo. IV. c. 73; The Agricola, 2 W. Rob. Adm. 10. It is to be observed, that the defence has been sustained, both to an action in rem and in personam. See, however, Martin v. Temperley, 4 Adol. & E. (N. S.) 298.

But if neither the ship is compelled by law to take the pilot, nor the owners are expressly exonerated by statute, they are subject to "the ordinary liability which attaches upon them, for the negligence of their servants." The Peerless, 2 Law T. (N. S.) 25, 3 Law T. (N. S.) 125; The Eden, 2 W. Rob. Adm. 442; Attorney General v. Case. 3 Price, 302; The Maria, 1 W. Rob. Adm. 95; See, also, The Fama, 2 W. Rob. Adm. 184; The George, Id. 388; The Batavier, Id. 407; The Transit, 1 Month. Law Mag. 582; The Christiana, 2 Hagg. Adm. 187; M'Intosh v. Slade, 6 Barn. & C. 657; The Duke of Sussex, 1 W. Rob. Adm. 270; The Vernon, Id. 316; The Gypsey King, 2 W. Rob. Adm. 537; The Ripon, 6 Notes of Cas. 246; Rodrigues v. Melhuish, 10 Exch. 110; The Mobile, 10 Moore. P. C. 467; Netherlands S. B. Co. v. Styles, 9 Moore, P. C. 286; Lucey v. Ingram, 6 Mees. & W. 302; The Girolamo, 3 Hagg. Adm. 169; The Baron Holberg, Id. 244; The Gladiator, Id. 340; The Eolides, Id. 367. As to burden of proof, see The Protector, 1 W. Rob. Adm. 47.

As no American statute is known, which, in terms, exonerates the owners for the negligence or tort of the pilot, the English authorities, since 1812, can only apply to those cases where a state statute compels the ship to take a pilot. In the recent case of The Carolus [Case No. 2,424], an action in rem, for collision, it is said by Curtis, J.: "If the pilot in charge of this ship had not been selected and employed by the owner, but had been received by the master, in obedience to a requisition of law, enforced by a penalty, then, under the authority of Carruthers v. Sydebotham, 4 Maule & S. 77; The Maria, 1 W. Rob. Adm. 95; The Agricola, 2 W. Rob. Adm. 10, the owners would seem not to be liable for the misconduct or mismanagement of the pilot." See, also, 3 Kent. Comm. 176, note. "In the case of The Agricola, it was considered, (and certainly with good reason,) that if the master of a vessel be bound to take a pilot, and a collision arises from the fault of the pilot, the owners are not responsible for his conduct." See, also, Griswold v. Sharpe, 2 Cal. 17. But in The Creole [Case No. 13,033], Grier, J., says, that the English cases, since 1812 "have not been adopted as precedents here." The case last cited, was an action in rem, for collision, in which the defence was, that the collision was caused by the culpable negligence of a licensed pilot, who was in charge of the colliding ship, and had been compulsorily taken, under the statute of Pennsylvania (March 29, 1803), which provides that every vessel "shall be obliged" to receive a pilot; if inward bound, the pilot who shall first offer; if outward bound, a pilot, whose name shall be reported by the master to the wardens. If the master neglect to make the report, he shall forfeit and pay $60, and if he refuse or neglect to take a pilot, he, his owner, or consignee, shall pay a sum equal to half pilotage, to the use of a benevolent society, named in the act. By a supplementary act, the "penalties" are declared to be liens on the ship. The court (Grier, J.) held that the ship was liable; that the statute was not compulsory; that the pilot was the servant of the owners, though "selected for them by persons more capable of judging of his qualifications;" and that the ship was hypothecated "for negligent or wrongful acts of her commander," whatever the mode of his appointment, or the motives and degree of consent which accompanied it, so that the statute, had it been compulsory, would have been no defence to an action in rem. See, also, Bussy v. Donaldson, 4 Dall. [4 U. S.] 206; Williamson v. Price, 4 Mart. (N. S.) 399; The Lotty [Case No. 8,524]; Story, Ag. § 456, a; Curt. Merch. Seam. 196, note.