## THE MARY FRASER.[1]

## MARCUSSEN and others v. THE MARY FRASER.

## LAURO v. SAME.

*(District Court, S. D. New York. March 17, 18 6.)*

1. COLLISION—ANCHORING—FOUL BERTH.

The bark S. having come to anchor at least 800 feet distant from another vessel, the ship F., which lay at anchor about half a mile from the Staten island shore, in New York harbor, *held*, that the position of the S. was not so dangerously near the F. as to render her liable to the charge of negligence for anchoring in a "foul berth."

2. SAME—TWO VESSELS—DRAGGING ANCHOR—NEGLIGENCE.

The bark S. having thus anchored near the ship F., the vessels swung at ease and without interference during four changes of the tide, both vessels being held by their port anchors only. Afterwards the ship F. dragged anchor, and drifted towards the bark S. until their cables fouled, when both began to drift. The F. dropped her starboard anchor, but the F. at no time dropped her starboard anchor. With the turn of the tide the ship drew across the bows of the bark S., and all efforts to separate them by the use of sails and lines being of no avail, and no tug being procurable, as the tide became stronger both vessels were carried down the stream until they collided with another vessel, the M., and again with another, the N., which latter, together with the bark S., was injured. *Held*, that it was negligence on the part of the ship F. that her starboard anchor was not let go as soon as she was perceived to be drifting, as well as afterwards, while the vessels were still apart. As the evidence showed no fault on the part of the bark S., *held*, that the latter was not bound to slip her port anchor for the F.'s benefit, nor to run the risk of paying out suddenly all her spare chain, but that the damage occasioned should be borne by the ship.

In Admiralty.

*James K. Hill, Wing & Shoudy*, for libelants.

*Sidney Chubb*, for claimants.

BROWN, J. The above libels arise out of damages caused by the drifting of vessels at anchor. On the seventh of August, 1885, the Norwegian bark Svalen was towed down the harbor upon the flood-tide, preparatory to going to sea, and came to anchor about half a mile off the Staten island shore at a distance variously estimated from 600 to 1,800 feet north-westerly from the British ship Mary Fraser which had been previously anchored there upon her arrival from sea.

One of the defenses of the claimants is that the Svalen anchored in a foul berth; that is, dangerously near the Mary Fraser. The two remained in the same relative position, however, for about 24 hours, during which time there were four turns of the tide, and they swung at ease without any interference with each other. The weight of evidence would show that they were at least 800 feet apart; and I find that, under the circumstances of their situation, that was sufficient

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

room, and not a foul berth for the Svalen, and that no charge of negligence in that respect is proved against her. *The Sapphire*, 11 Wall 170; *The Princeton*, 3 Prob. Div. 90; *The Julia M. Hallock*, 1 Spr. 539.

About 4 o'clock on the afternoon of the eighth of August, the tide being flood, the Mary Fraser was seen slowly drifting up towards the Svalen, dragging her anchor. This was observed upon both vessels at about the same time. Both were anchored by their port anchors only. Had the Fraser then dropped her starboard anchor at once, as she might have done, I have no question that all the subsequent difficulties would have been avoided. She did not do so, but continued to drift upwards until her chain fouled the Svalen's cable, which then held both in place. Soon afterwards the ship commenced to haul in her cable, which caused both vessels to drift, and made it clear that their chains were afoul. The hauling in was stopped; the Svalen let go her starboard anchor; and both were thus held in place for a couple of hours or more afterwards. The vessels were prevented from fouling by putting their helms in contrary directions, and the tide, under such helms, was sufficient to keep them from 20 to 50 feet apart, the ship's stern overlapping the Svalen's bows. They lay in this position for two or three hours, during which time efforts were made to obtain a tug; but, the day being that of Gen. Grant's funeral, no tug could be obtained. With the turn of the tide the ship drew gently under the bows of the Svalen, and both swinging round in this position, various efforts were made, by sails and lines, to separate them; but without avail. As the ebb-tide became strong, the ship, lying somewhat across the bark's bow, was under so great a pressure from the current that she could not be extricated; and presently both were carried down the stream together. The Marshall, lying at anchor below, was first struck, but without doing much injury to either; but, on striking a fourth vessel, the Navigatore, the shock was sufficient to clear the chains previously afoul, and thereby let the ship go free; but the collision damaged the Svalen and the Navigatore. The above libels were filed to recover these damages.

Without specifying further the numerous details of this case, it seems clear to me that if the officers of the ship, when she was first observed to be drifting, had let go their starboard anchor, no subsequent damage would have been done. This was the appropriate and the proper remedy, and was fully within their power. Any other reliance was plainly at the risk of the vessel, and of doubtful result. I must hold it, therefore, negligence on the part of the Mary Fraser that her starboard anchor was not let go as soon as she was seen to be drifting. During the two hours, also, after the two chains had fouled, the same remedy was possible. When they were 25 or 50 feet apart the Fraser's starboard anchor could have been dropped, her port cable slipped and buoyed, or connected with the Svalen for safety, and the Fraser thereby have been dropped safely astern. Her omis-

sion of either·of these precautions was at her own risk, and makes her answerable for the subsequent damages. *The Eloina,* 10 Ben. 458, 459; *The Northampton,* 1 Spink, Adm. 152.

2. No fault is proved on the part of the Svalen. When both were drifting together, it was plainly the duty of the Svalen, having reference to the vessels astern, to drop her starboard anchor as she did. Afterwards, when the ship got across her bows, and was trying to get clear by her sails, it was urged that the Svalen should have let go all her spare chain in order to ease the pressure. The evidence seems to show that she had still some chain not paid out; but the tide was acting very much more strongly upon the ship, which lay across the· bark, than on the Svalen herself. The suggestion that easing up on her cable would have enabled the ship to get clear is mere speculation and hypothesis, and, in my judgment, improbable; and hence not a sufficient ground for holding her in fault. There is no probability that it would have done any good; certainly not, without letting it all go suddenly, and that would be a dangerous expedient, and an experiment only, which the Svalen was under no obligation to adopt for the Fraser's benefit, not being herself in fault.

The other points urged against the Svalen seem to me without weight.

The day was calm and fine. The officers of the Fraser probably thought they could avoid any damage without the trouble of letting go the starboard anchor, and would get clear by tripping the port anchor and going astern. Afterwards they were no doubt reluctant to slip their port cable, preferring to rely upon their chances of getting clear by means of their sails; but the wind was so light, and the pressure of the tide so strong, that this was impossible. The Svalen was not bound to slip her own cables, not being in fault. It was at the ship's risk that she delayed in taking efficient measures to check her drifting by dropping her starboard anchor in time. The damages must, therefore, be charged upon her.

Decree for the libelants, with costs.