HOMER RAMSDELL TRANSP. CO. v. COMPAGNIE GENERALE TRANSATLANTIQUE.

(Circuit Court, S. D. New York. May, 1894.)

1. PILOTS—NEGLIGENCE—KNOWLEDGE OF CURRENTS.

Delay of the pilot of a steamship in reversing to avoid evident danger from her failure to maneuver in the usual manner, caused by an undercurrent, is negligence, not mere error of judgment, although he may have supposed that the interruption of her movement was only temporary, for he is chargeable with knowledge of the currents.

2. SHIPPING—LIABILITY FOR TORT—NEGLIGENCE—STEAMSHIP LEAVING NEW YORK.

An ocean steamship is not negligent in backing out from her dock at New York to go out on the ebb tide, with only one tug to assist her in turning in the river, where the tug is a powerful one, and its use is continued as long as practicable, as this can be done safely, with proper care, and it is customary to employ but one tug for the purpose.

3. SAME—DUTY OF MASTER OF VESSEL IN CHARGE OF PILOT.

While the navigation of a steamship is under control of a pilot, her master is not in fault for failing to interpose his authority to stop her in order to avoid danger from her failure to maneuver as usual, caused by an undercurrent, where he suggests such danger to the pilot, and the pilot thinks it may be avoided without stopping; the case not being one of extreme peril or of incompetency on the part of the pilot.

4. PILOTS—COMPULSORY PILOTAGE.

The New York pilot law, giving the outward pilotage of a foreign ship to the pilot who brought her in, or, in case of objection, to another assigned by the commissioners of pilots, and subjecting the master and owner to penalties in case of refusal, and making refusal by the master a misdemeanor, is compulsory.

5. ADMIRALTY JURISDICTION—DAMAGE TO PIER BY VESSEL.

Admiralty has no jurisdiction of a suit against either a vessel or her owner for damage to a pier by the vessel striking it, such injury not being a maritime tort.

6. SHIPPING—LIABILITY FOR TORT—NEGLIGENCE OF COMPULSORY PILOT.

A shipowner is not liable at common law for damages caused by negligence of a pilot compulsorily employed.

This was an action by the Homer Ramsdell Transportation Company against the Compagnie Generale Transatlantique, owner of the steamship La Bretagne, for damages to a pier, tried before a referee.

Enoch L. Fancher and William H. Harris, for plaintiff.

Jones & Govin (Edward K. Jones, of counsel), for defendant.

WM. G. CHOATE, Referee. This is an action at common law against the owner of the steamship La Bretagne for damages caused to the plaintiff's pier No. 42 North river, under the following circumstances: The La Bretagne was lying at her dock, No. 42 North river, on the 10th December, 1892. About five minutes after 8 o'clock in the morning, the tide being about the last of the ebb, the La Bretagne was backed out of her slip in order to start on her voyage to Havre. She was in charge of a Sandy Hook pilot. The tide being ebb, her wheel was put hard a-port, and she was backed towards the west side of the river as far as it is usual or safe to bring her. A tug was employed to push her stern up stream, and her engines were started

full speed ahead. She began to turn down the river, but, when she had reached about the middle of the river, it was observed by the master and pilot, who were together on the bridge, that she had ceased to turn. The master and pilot were in consultation,' and the master suggested that it might be better to stop her. The pilot, however, thought that she had still room to turn in the river, and did not immediately give the order to slow or stop; but, after she had run a short distance further, he gave the necessary orders to slow, stop, and back at full speed, but, in spite of these precautions, she ran into the plaintiff's pier, striking it with her bow at an angle of 45 degrees, some 20 feet or more from the end on the north side, and inflicted considerable damage.

It is claimed on the part of the defendant that there was no negligence in the management of the steamer on the part either of the master or the pilot, but, at most, an error of judgment, for the consequences of which no action would lie. I think, however, that it is clear that the pilot was negligent. The cause of the arrest of the turning of the steamer was probably an undercurrent of the new flood tide striking her bottom. It was or should have been evident to him, before he gave the order to reverse, that there was great danger of her running into the pier. He is chargeable with knowledge of the tides and currents, and cannot claim as a pilot to have been surprised at the action of the ship. He seems to have supposed that the failure of the ship to turn to starboard was temporary, and would be presently overcome. In this he took too great a risk, and should have given the order to reverse sooner than he did, and thereby the accident would have been avoided.

It is claimed on the part of the plaintiff that there was negligence in going out upon the ebb tide; also, in not employing two tugs instead of one to turn the stern of the ship up stream, and in not continuing the use of the tug which was employed longer in that service. It was shown, however, that the tug employed was a powerful tug; that it was customary to employ one tug, and not two, for this purpose; and that the tug so employed pushed against the stern as long as it was practicable to do so after the engines of the ship were started forward, and that it was necessary to start the engines forward to prevent her striking on the other side of the river. It was also proved that steamers backed out and turned in the river upon the ebb tide, and that with proper care on the part of the pilot this can safely be done. These allegations of fault, therefore, appear to me to be groundless.

The next question is whether there was any fault on the part of the master in not interposing his authority to control the action of the pilot, and to insist that he should stop the ship or back her sooner than she was stopped and backed. There seems to be no doubt of the authority of the master in an extreme case to supersede the authority of the pilot, and to take charge of the ship himself, where it is necessary for the safety of the ship or the avoidance of imminent danger. The cases, however, all agree that it must be an extreme case of obvious danger, or incapacity on the part of the pilot, to authorize such interference. As regards the

navigation of the ship, she is under the exclusive control of the pilot; and, even while the master believes that the action of the pilot is indiscreet or involves danger, it does not follow that he should interfere with the navigation. He may do his whole duty by pointing out what he conceives to be the danger, and leaving the responsibility where it is, upon the pilot.

In the case of The Maria, 1 W. Rob. Adm. 110, Dr. Lushington says:

"It would be a most dangerous doctrine to hold, except under most extraordinary circumstances, that the master could be justified in interfering with the pilot in his proper vocation. If the two authorities could so clash, the danger would be materially augmented, and the interests of the owners, which are now protected both by the general principles of law and specific enactments from liability for the acts of the pilot, would be most severely prejudiced. It is the duty of the master to observe the conduct of the pilot, and in the case of palpable incompetency, whether arising from intoxication or ignorance or any other cause, to interpose his authority for the preservation of the property of his employers."

So in The Lochlibo, 3 W. Rob. Adm. 329, the same learned judge says:

"I should never go to the length of saying that the mere suggesting to the pilot on the part of the master to take in this sail, or otherwise to keep as near the South Sand light, and vice versa, or to bring the ship up, was 'interfering,' in the legal acceptation of the term, with the duties of the pilot. Illegal interference is of a different description. If, for example, in this case, the boatswain had called out to the man below to starboard the helm, or if the master had called out to port the helm, it would be interference; but it would not be interference to consult the pilot, or to suggest to him that the measures pursued were not proper, or that other measures would in all probability be attended with greater success."

In the case of Camp v. The Marcellus, 1 Cliff. 491, Fed. Cas. No. 2,347, Mr. Justice Clifford says:

"While on board, the pilot, in the absence of the master, has the exclusive control and direction of the navigation of the vessel; but if the master is present, the power of the pilot does not so far supersede the authority of the master that the latter may not, in case of obvious and certain disability or gross ignorance and palpable and imminent danger or mistake, disobey his orders, and interfere for the protection of the ship and lives of those on board. Divided authority in a ship with reference to the same subject-matter is certainly not to be encouraged, and can never be justified or tolerated except in case of urgent and extreme necessity. While standing by and witnessing a self-evident mistake, manifestly and imminently endangering the ship and certain to cause a collision, the master should not remain silent, but might well interpose, so far at least as to point out the error and suggest the proper corrective."

In the present case the master did his full duty in suggesting to the pilot the danger of proceeding, but, in answer to his remonstrance, the pilot explained that he thought the ship would come round. His knowledge, or supposed knowledge, of the tides and currents, and their effects upon the ship, is or should be far superior to that of the master. It is on account of this superior knowledge that the ship is obliged to employ the pilot, and I think it is clear that this case does not come within that class of cases of extreme peril or incompetency in which the master is justified or it becomes his duty to take the management and navigation of the ship out of the hands of the pilot.

The next question is whether the owner of a ship is liable at common law for damages occasioned by the negligence of a pilot compulsorily employed.

There is no doubt in this case that the law of New York compels the ship to employ a pilot appointed by the state. By the New York pilot law, a foreign ship, when inward bound, is obliged to take the first pilot that offers his services. While the masters of certain vessels may be licensed to pilot their own vessels, it is provided in the statute that all vessels from foreign ports shall take a licensed pilot, or, in case of refusal, pay full pilotage; and it is further provided that any person not holding a license who pilots a vessel in or out of the harbor of New York shall be held guilty of a misdemeanor, and any one employing a person not holding a license to pilot a vessel shall forfeit and pay the sum of $100. The provision with regard to outward pilotage is that the pilot who brought in the ship has the right, by himself or one of his boat's company, to take her out, unless he has been complained of for misconduct, subject, however, to the right of the shipowner to object to this particular pilot, in which case the commissioners of pilots shall assign another pilot from the same boat's company to take the ship out. 3 Rev. St. (7th Ed.) pp. 2017, 2019, 2020. If the shipowner were at liberty to select a pilot out of a class of pilots licensed by the state, it could not be held that the shipowner was compelled to take the particular pilot employed. But the right to object to one particular pilot certainly does not make the appointment of another selected by the commissioners from the same boat's crew a voluntary appointment by the owner of the vessel of such substituted pilot.

In the case of The China, 7 Wall. 53, the majority of the court held that the New York statutes created a system of compulsory pilotage. Both the master and the owner are subjected to penalties besides their liability to pay full pilotage in case of their refusal; and, as to the master, such refusal is expressly made a misdemeanor. It seems to me there can be no question that the pilotage is compulsory.

The plaintiff has proceeded by a common-law action. He could not do otherwise, because the tort for which he proceeds is not a marine tort, not being consummated on navigable water. The pier injured is part of the land. The Plymouth, 3 Wall. 20; The Maud Webster, 8 Ben. 547, Fed. Cas. No. 9,302; The Neil Cochran, 1 Brown, Adm. 162, Fed. Cas. No. 10,087; The Ottawa, 1 Brown, Adm. 356, Fed. Cas. No. 10,616; The M. R. Brazos, 10 Ben. 437, Fed. Cas. No. 9,898. The admiralty, on the foregoing authorities, would have had no jurisdiction to entertain the suit for the damage done to this pier, either against the vessel or against her owner. The question involved, therefore, is one strictly of liability at common law.

In England it is settled, after a good deal of discussion, that independently of the statutes regulating pilotage, and which exempt the owner from liability, the owner of a vessel cannot be held at common law personally liable for the negligence of a pilot whom the vessel is compelled to employ, for the reason that the ground of the lia-

bility of the owner for the negligence of those who navigate the vessel is based upon the relation between the owner and the parties guilty of negligence,—of master and servant, or principal and agent, —and that as no such relation exists between the owner and the pilot, who is imposed upon him by the superior authority of the state, the reason for the liability in case of a master or crew appointed by the owner ceases. The English courts, however, hold that if the master or crew co-operate in any way in the negligent act of the pilot, or the damage is caused by their disobedience of his orders, the owner is liable. To exempt the owner, the fault must be that of the pilot alone. The principal English cases are the following: The Maria, 1 W. Rob. Adm. 102; The Protector, Id. 54; The Agricola, 2 W. Rob. Adm. 19; The Neptune Second, 1 Dod. 467; The Christiana, 7 Moore, P. C. 171; The Girolamo, 3 Hagg. Adm. 169; Bennet v. Moita, 7 Taunt. 258; Attorney General v. Case, 3 Price, 303; The Annapolis, Lush. 312; Carruthers v. Sydebotham, 4 Maule & S. 77; The Halley, L. R. 2 Adm. & Ecc. 3, L. R. 2 P. C. 201. And the rule so established is quite in accordance with the general principle of the law of master and servant, or principal and agent, which holds one person liable for the tortious act of another only where the person committing the wrong is employed by the person sought to be held.

The mere fact that the person sought to be held derives some benefit in an indirect way from the act done is not enough if the person committing the wrong is employed by another party exercising an independent employment. Thus, a party hiring a carriage of a livery stable keeper is not liable for the negligence of the driver, and a butcher employing a licensed drover to lead a bullock through a city is not liable for the negligence of the servant of the drover, and a railroad company is not liable for the negligent act of the servant of the contractor who builds the road. Laugher v. Pointer, 5 Barn. & C. 547; Milligan v. Wedge, 12 Adol. & E. 737; Reedie v. Railway Co., 4 Exch. 244.

In this country the question of the liability of the owner of a ship for the act of a compulsory pilot has received considerable discussion, but there appear to be only two cases in which the point has been directly decided that the owner is liable in personam in such case. These are the cases of Bussy v. Donaldson, 4 Dall. 206, by the supreme court of Pennsylvania, decided in 1800, and Williamson v. Price, 4 Mart. (N. S.) 399, decided in 1826, by the supreme court of Louisiana. There are dicta, however, to the same effect in other cases in this country, and especially in the case of The China, supra, where Mr. Justice Swayne, delivering the opinion of the court, disapproves of the rule of the English cases, and cites with approval the case of Bussy v. Donaldson. The case of The China, however, was the case of proceeding in rem against the vessel for damages from a collision caused by the fault of the pilot, and the decision stands upon a ground wholly independent of the personal liability of the owners. As the court says in that case:

"The maritime law as to the position and powers of the master, and the responsibility of the vessel, is not derived from the civil law of master and serv-

ant, nor from the common law; it had its source in the commercial usages and jurisprudence of the middle ages. * * * According to the admiralty law, the collision impresses upon the wrongdoing vessel a maritime lien. This the vessel carries with it into whosesoever hands it may come. It is inchoate at the moment of the wrong, and must be perfected by subsequent proceedings."

On the question of the liability of the vessel, the case of The China has been followed by the same court in the case of The Merrimac, 14 Wall. 199, which was not, however, a case of compulsory pilotage, like the case of The China.

The opinion in the case of Bussy v. Donaldson, 4 Dall. 206, by Shippen, C. J., shows that the point was taken before the court that the owner was not liable for the reason that the pilot was not the servant of the owner, but the officer of the state. The court says of this point:

"The distinction is rather plausible than solid. The legislative regulations were not intended to alter or obliterate the principles of law by which the owner of a vessel was previously responsible for the conduct of the pilot, but to secure in favor of every person (strangers as well as residents) trading to our port a class of experienced, skillful, and honest mariners to navigate their vessels safe up the bay and river Delaware. The mere right of choice, indeed, is one, but not the only, reason why the law in general makes the master liable for the acts of his servant; and, in many cases where the responsibility is allowed to exist, the servant may not in fact be the choice of the master. For instance, if the captain of a merchant vessel dies on the voyage, the mate becomes captain, and the owner is liable for his acts, though the owner did not hire him originally, nor expressly choose him to succeed the captain. The reason is plain. He is in the actual service of the owner, placed there, as it were, by the act of God. And so, in the case under consideration, the pilot was in the actual service of the owner of the ship, though placed in that service by the provident act of the legislature. The general rule of law, then, entitles the plaintiff to recover; and we have heard of no authority—we can recollect none —that distinguishes the case of a pilot from those numerous cases on which the general rule is founded."

Smith and Brackenridge, JJ., concurred.

The reasons given for the rule seem to depend more upon considerations of convenience than upon strict legal principle. If the effect of the legislative regulation was to take the ship out of the hands of her owner, and put her in the hands of a public officer, there seems to be no principle of law under which the owner could be responsible for the negligence of such public officer, even if the legislative act did not express any intention to alter or obliterate what would otherwise have been the responsibility of the owner for the act of the pilot; that is, for the act of a pilot appointed by the owner. Of the many cases said to exist of responsibility for the act of another, though such other was not the choice or appointee of the person held liable, the illustration is not a fortunate one. In case of the death of the captain, the mate becomes captain, with the consent and by the authority of the owner; and, whether appointed by the owner himself or by the captain, he is appointed by the act of the owner, or by his authority, and it is a part of his understood duty by the maritime law to take command of the vessel in case of the death of the captain. So as to the circumstance that the voyage is for the benefit of the owner, and that the pilot is in his actual service,

in the sense that he is working towards the completion of the voyage upon which the ship is sent by the owner, the same argument would hold with reference to the passenger in the livery stable carriage, and would impose a responsibility for the drover's servant upon the owner of the bullock, and, indeed, would impose responsibility upon the owner of a ship for the negligent act of the master or crew employed by the charterer.

The law is well settled that if the terms of the charter party are such as to amount to a demise of the ship, putting her out of the control and possession of the owners, and under the control and into the possession of the charterers, who appoint the master and crew, the owners are not responsible for the negligent acts of the master and crew, whether to persons contracting with the master as shippers of cargo, or to outside parties injured by negligent navigation, except, perhaps, as to the former, who may be ignorant of the terms of the charter party and who contract with the master, believing him to be the servant of the owners. The test of liability of the owner in such cases is whether the master and crew were his servants or not. Fenton v. Steam Packet Co., 8 Adol. & E. 835. For a very full and careful statement of this doctrine and the authorities, see Abb. Shipp. (12th Ed.) pp. 57–70. And yet in all such cases the ship is liable for negligent navigation in the admiralty in rem (The Ticonderoga, Swab. 215; The Tasmania, 13 Prob. Div. 110; The Lemington, 2 Asp. Mar. Law Cas. [N. S.] 475); and the only limitation of this liability in rem which these cases suggest is that the liability of the ship in rem ceases where she is navigated, and the injury is done by some one not deriving his authority to navigate her from the owners; that is, if a ship is sent to sea without the owner's consent or tortiously, she may not be bound in rem.

The analogy of the non-liability of the owners of a ship under charter, and therefore out of control of the owners, and navigated, not by their servants, but by the servants of other persons, certainly supports strongly the defense in this case.

Since the case of Bussy v. Donaldson, the true ground and limit of the liability of the master or principal for the negligence of the servant or agent has been very carefully considered both in England and in this country, and, unless an exception is made with regard to a vessel and the owners of vessels, the case of Bussy v. Donaldson is out of harmony with the law of master and servant, and principal and agent, as now held. The argument of convenience with regard to the remedy is, indeed, made a reason for this exceptional liability in the case of Williamson v. Price, 4 Mart. (N. S.) 399. I think both in that case and in the case of Bussy v. Donaldson the court assumed that the pilotage was compulsory. The Louisiana case is decided largely upon the authority of Bussy v. Donaldson and the case of The Neptune Second, 1 Dod. 467, which latter case was afterwards overruled. The court refers to the case of Fletcher v. Braddick, 5 Bos. & P. 182, as sustaining the rule. That was a case of a vessel chartered by the defendant to the government, and having on board a naval officer, who had in general the command of the ship, but the master and crew were appointed by the owner. It seems, however, that

that case is rather an authority against the liability in case of compulsory pilotage, because the damage being caused by fault of navigation, the owner was held liable, but the court intimated that, if it had been caused by the fault of the naval officer, he might not be liable.

The argument of convenience is thus stated by the supreme court of Louisiana:

"It seems hard, on the one side, that while necessity, and in many places the law, compels to place a vessel under the absolute command of a pilot, his misconduct should subject to damages the owner of the ship, on whom he is, it may be said, forced; but, on the other hand, pilots are very seldom persons able to compensate the owner of a vessel run foul of. The owner of a vessel by whom the damage is done receiving the benefit of the voyage, it has been judged he should indemnify persons injured by his vessel while employed for his benefit."

This argument from convenience, as a reason for holding the owner liable, is stated by the court in the case of The China thus:

"The maxim of the civil law 'sic utere tuo ut non laedas alienum' may, however, be fitly applied in such cases as the one before us. The remedy of the damaged vessel, if confined to the culpable pilot, would frequently be a mere delusion. He would often be unable to respond by payment, especially if the amount recovered were large. Thus, where the injury was the greatest, there would be the greatest danger of a failure of justice."

The same reason is stated by Parker, C. J., in the case of Yates v. Brown, 8 Pick. 22. But that was not a case of compulsory pilotage.

The argument from convenience, or a desire to secure to the party injured a remedy against the person who can respond in damages, which it is assumed a pilot ordinarily cannot do, may have had its legitimate influence in establishing the rule of maritime law making the vessel liable for all torts committed by her, at least where she is navigated with the consent of, or under authority derived from, the owners. She goes from port to port; and, if she were not herself held responsible in the maritime courts of the world for her torts, persons injured thereby would for the most part be remediless; and this may have been the reason for the rule making her liable,—a rule of so great antiquity that the time and manner of its origin are lost in the past, but so wholesome that it stands undisturbed to this day wherever the maritime law is administered. It is not necessary to inquire whether the decision in the case of The China was a correct application of this principle according to the general maritime law. It must be assumed that that decision is at present the established law of our courts of admiralty so far as relates to the liability of the vessel in rem. But such an argument from convenience has no place in determining the question of a common-law liability of the owner, which rests upon rules of law governing the responsibility of the master for the acts of the servant or the principal ·for the acts of the agent. That the liability in personam of the owner does stand upon this principle, in this country as well as in England, appears by the case of Sturgis v. Boyer, 24 How. 123, in which it was held that a vessel employing a tug to move her from place to place is not liable for the fault or negligence

of the master and crew of the tug who are employed by the owners of the tug.   Mr. Justice Clifford there says:

"Unless the owner and the person or persons in charge of the vessel in some way sustain towards each other the relation of principal and agent, the injured party cannot have his remedy against the colliding vessel.   By employing a tug to transport their vessel from one point to another, the owners of the tow do not necessarily constitute the master and crew of the tug their agents in performing the service.   They neither appoint the master of the tug nor ship the crew, nor can they displace either the one or the other.   Their contract for the service, even though it was negotiated with the master, is, in legal contemplation, made with the owners of the vessel, and the master of the tug, notwithstanding the contract was negotiated with him, continues to be the agent of the owners of his own vessel, and they are responsible for his acts in her navigation."

In that case the court follows and approves the case of Sproul v. Hemmingway, 14 Pick. 1, in which Chief Justice Shaw discusses the question at considerable length of the ground of liability of the owner of a vessel at common law for the negligence of the master and crew of a tug employed to tow her; and the liability was denied, on the ground that the master and crew, who were guilty of negligence, were not the servants of the owner of the ship.

While the English courts have reached a different conclusion from the supreme court as to the liability of the tow and her owner for the negligence of those in charge of the tug, yet it is upon grounds which do not conflict with the principle of the liability of the master for the acts of a servant.   That difference is carefully pointed out by Judge Lowell in the case of The Belknap, 2 Low. 281, Fed. Cas. No. 1,244.   The English courts have taken a different view of the relation between the owner of the ship and those managing the tug.   The latter are held to be the servants of the former.   The owner of the vessel is held responsible as a master for the acts of his servant, under the doctrine of "respondeat superior."   The Belknap, Id.   It is not pertinent to the present inquiry whether in Sturgis v. Boyer, which was a suit in rem, it was rightfully assumed by the court that the vessel was not liable if the owners would not be liable in personam, or whether that case can be reconciled with the later case of The China, in respect to the liability of the vessel.

The case of Smith v. The Creole, 2 Wall. Jr. 485, Fed. Cas. No. 13,033, was a libel in rem against the vessel in admiralty.   So, also, was the case of The Lotty, Olcott, 329, Fed. Cas. No. 8,524.

The other American cases cited in support of the liability of the defendant are clearly distinguishable.

The case of The Julia M. Hallock, 1 Spr. 539, Fed. Cas. No. 7,579, does not appear to be a case of compulsory pilotage.   The Massachusetts pilot law, while requiring a vessel refusing a pilot to pay pilotage fees, is not regarded as making pilotage compulsory.   The Carolus, 2 Curt. 69, Fed. Cas. No. 2,424; Camp v. The Marcellus, 1 Cliff. 481, Fed. Cas. No. 2,347.

The case of Snell v. Rich, 1 Johns. 305, involved the question of the liability of the master while the pilot was on board.   As stated in the case of The China, the liability of the master does not depend upon the rules of the common law, but the rules and usages

of the maritime law. It is evident from the opinion of Mr. Justice Curtis in the case of The Carolus, ut supra, that, if the pilotage had been compulsory, he would have held the owner not liable; and although this dictum is disapproved by Mr. Justice Clifford in the case of Camp v. The Marcellus, 1 Cliff. 492, Fed. Cas. No. 2,347, it would seem to be well founded, both on reason and authority.

The case of Yates v. Brown, ut supra, indeed states the general proposition that the owners of a vessel which, by collision with another vessel, has caused damage through the fault or negligence of any one on board, is answerable to the injured party in respect of their property, notwithstanding there may be a pilot on board, who has entire control and management of the vessel. It is put upon the ground of inconvenience. It is doubtful if in that case the pilotage was understood by the court to be compulsory. In the other Massachusetts cases the pilotage has been held not compulsory. Of course, if the owner accepts a pilot not by compulsion of law, but voluntarily, no distinction can be made between the negligent acts of such a pilot and a master appointed by the owner; but it appears to be true of the case last cited, as of many others in which the doctrine of a more convenient and satisfactory remedy for the injured party is urged, that the court adopted and applied to the question of the liability of the owner, consciously or unconsciously, the principle of the maritime law which imposes a liability upon the vessel, which principle is not strictly or properly applicable where the case has to be determined purely upon the principles of the common law. The liability of the owner in personam by the maritime law has been said to be the same as at common law (The Germania, 9 Ben. 356, Fed. Cas. No. 5,360); and I find no cases inconsistent with this dictum.

It is certainly most unjust to give a remedy against a party who is not legally responsible because the injured party may have an inadequate remedy against the party who is legally liable; and, with the utmost respect for the courts which have put the liability of the owners on the argument of convenience, I am unable to follow them, or to attribute to this circumstance the effect of making a distinction between vessels and other chattels as respects the liability of the owners for negligence in their use. I think the common law makes no such distinction.

The case of Denison v. Seymour, 9 Wend. 1, was the case of a vessel in charge of a pilot appointed by the owners, and the question before the court related to the liability of the master in such case. It has no bearing upon the question involved in the present case.

While, therefore, it must be admitted that there is some authority and many dicta in favor of holding the owner of a vessel liable for the negligence of a pilot compulsorily imposed upon the vessel, I have come to the conclusion that, both upon reason and authority, the rule is otherwise, and that, therefore, the defendant in this case is entitled to judgment.

The objection that this pier was the property of the city, and that the city is but a part of the government of the state, and that it was the agent of the state whose negligent act caused the injury,

has no merit as a ground for refusing relief in damages. The argument seems to be that the property destroyed was not the property of the plaintiff, but the property of the state. The action, however, is for the injury to the private and individual interest of the plaintiff in this property, the fee of which belongs to the public. By obtaining a lease from the city, the plaintiff acquired an interest which is entirely independent of the property of the state; and by the terms of the lease the plaintiff was under obligation to repair the pier, and both upon the ground of this obligation, whereby the plaintiff has been injured, and also upon the ground of the plaintiff's special interest in the pier, which is quite independent of that of the state or the city, which special interest has been damaged by the act of the pilot, it would be no obstacle, in my opinion, to the plaintiff's recovering the damage, if otherwise entitled, that the fee in the land is vested in the city, as one of the departments of the state government.

So, also, the defense set up in the answer that the "Harter Act," so called, (27 Stat. 445, c. 105), relieves vessels from all liability for the negligent act of the master and crew if the vessel is properly manned and equipped for the voyage, cannot be sustained. That act is limited to the regulation of the liability of the vessel, her owners, and master, to the shipper, and has no application to torts committed against other persons or their property, nor do its provisions seem to be retroactive. This tort was committed before the passage of the act.

The amount of the damages may, however, be properly determined upon this reference, in order that judgment for the proper amount may be finally entered if the court should hold the plaintiff entitled to recover. It is proved that the cost of repairing the plaintiff's pier was $13,153.34. Of this amount, $5,460 was paid by the plaintiff on the 15th February, 1893, and the balance on the 15th March, 1893; and interest is to be allowed on those payments from the said dates respectively. It is also proved that the plaintiff lost the opportunity to rent out a part of the pier, in consequence of the damage, for a period of three months. There was a demand for such property, and the plaintiff could have obtained for it, during the period it was thus deprived of its use, $2,250; and I think the plaintiff would be entitled to recover this sum in addition to its actual expenses, with interest from the 15th day of March, 1893, if it were entitled to a judgment.

But, for the reason given above, the defendant is entitled to judgment, with costs.