74 U.S. 53 (____)
7 Wall. 53
THE CHINA.
Supreme Court of United States.

*55 Mr. D.D. Lord, for the owners of the China, appellants.
Mr. Evarts, contra.
*58 Mr. Justice SWAYNE delivered the opinion of the court.
This is a case arising out of a collision between the steamship China, a British vessel, then leaving the port of New York for Liverpool, and the brig Kentucky, then on a voyage from Cardenas to New York. The facts are few and undisputed. The collision occurred on the 15th of July, 1863, a short distance outside of Sandy Hook. The brig was sunk. The steamship was wholly in fault. It was not alleged, in the argument here for the appellants, that there was either fault or error on the part of the brig. The case turns upon the effect to be given to the statute of New York, of the 3d of April, 1857. At the time of the collision the steamship was within the pilot waters of the port of New York, and was in charge of a pilot, licensed under this act, and taken by the master pursuant to its provisions. The pilot's orders were obeyed, and the catastrophe was entirely the result of his gross and culpable mismanagement. No question was made in the argument, upon the subject; the evidence is too clear to admit of any. These are all the facts material to be considered.
The questions with which we have to deal, are questions of law. No others arise in the case.
It is insisted by the appellants that the statute referred to compelled the master of the steamship to take the pilot, and that they are therefore not liable for the results of his misconduct.
*59 British adjudications are relied upon in support of both these propositions. In order to appreciate these authorities, the British pilot acts must be understood. They are the 52 George III, ch. 30; the 6 George IV, ch. 125; the Shipping Act of the 17 and 18 Victoria, ch. 104; the Liverpool Pilot Act of 37 George III, ch. 789, and the Newcastle Pilot Act of the 41 George III, ch. 86. The three first mentioned contain equivalent provisions. The same remark applies to the two latter. The former all contain a clause to the effect that the "owner or master of any ship shall not be answerable for any loss or damage occasioned by the neglect, default, incompetency, or incapacity of any licensed pilot." The latter contain a system of local pilot regulations, but have no such provision. They require that a pilot shall be taken, and if not taken, that pilotage shall, nevertheless, be paid. In these respects, and in most others, they are substantially the same with the statute of New York.
1. Was the steamship compelled to take the pilot?
In the case of The Maria,[*] in which the Liverpool Pilot Act was largely considered, Dr. Lushington said: "It never was decided that a clause requiring a pilot to be taken on board, or if not taken, the pilotage to be paid, was not compulsory... ... Now the Liverpool Pilot Act provides for three cases: 1st. The case of vessels homeward bound; 2d. Of vessels outward bound; and lastly, of vessels lying at anchorage; and with reference to homeward bound vessels, it is provided in the twenty-fourth section of the act, that if the master refuses to take a pilot on board, he is liable to the payment of pilotage. There is, therefore, this distinction in the two cases: that in the case of a vessel at anchor, the taking of the pilot on board is perfectly optional with the master, but in the case of a homeward bound vessel, it is enjoined upon him by the provisions of the act, and if he refuses so to do, he is rendered liable to the payment of the pilotage dues. This, in my opinion, amounts to compulsion to take such pilot on board, and it was so held by the learned judges by whom the *60 case of Sidebotham v. Caruthers was decided. What says Mr. Justice Le Blanc? `It appears that the master was compellable to take the pilot on board, and it was in consequence of his misconduct that the vessel was placed in such a situation, that when the water left her, she fell upon her side, and thus the damage happened.' Without going further into the case, it is sufficient to observe, that Lord Ellenborough and Mr. Justice Bailey were of the same opinion, that the master was compellable to take the pilot on board."
Other authorities to the same effect might be referred to, but it is deemed unnecessary. The one we have cited is sufficient.
Suppose the New York statute, in the event of a refusal to take a pilot on board, instead of full pilotage had given the vessel or cargo to the pilot. Whether the amount to be paid were large or small, it would operate in the same way, and involve the same principle. The difference would be not in the fact but in the degree of compulsion. If it be said the master had the option to pay the pilotage, and proceed without the pilot, the answer is, that he would have had the same option if the consequence had been fine and imprisonment, or the visiting upon him of any other penal sanction. In each case there would be compulsion, measured in its force by the means prescribed to make it effectual. A duty is enjoined, and an obligation is imposed. The alternatives presented are to receive the pilot; or to refuse and take the consequences.
In this connection it is proper to consider the particular provisions of the New York statute. It enacts that the master "shall take a licensed pilot;" that in case of refusal, pilotage shall be paid, and that it shall be paid to the first pilot offering his services. Any person not holding a license under this act, or the law of New Jersey, who shall pilot or offer to pilot any vessel to or from the port of New York, by way of Sandy Hook, except such as are exempt by virtue of this act; or any master on board a steamtug who shall tow such vessel without a licensed pilot on board, shall be punished by a fine not exceeding one hundred dollars, or *61 imprisonment not exceeding sixty days; and all persons employing a person not licensed under this act, or the laws of New Jersey, are subjected to a penalty of one hundred dollars.
It was contended by the counsel for the appellee, that if the master had chosen to proceed without a pilot, he would have been liable only to the payment of pilotage; and that none of the other penal provisions of the statute, according to its true meaning, apply in such a case. We have not found it necessary to examine this subject. Giving to the statute either construction, it seems to us clear, in the light of both reason and authority, that the pilot was taken by the steamship upon compulsion.
2. This brings us to the examination of the second proposition. Does the fact that the law compelled the master to take the pilot, exonerate the vessel from liability?
The immunity of the wrongdoing vessel when the pilot is in charge, and alone in fault, is now well settled in English jurisprudence, both in the Admiralty Court and in the courts of common law. The rule must necessarily be the same in both. In such cases the liability of the ship and of the owner are convertible terms. The ship is not liable if the owners are not; and no responsibility can attach to the owners, if the ship is not liable to be proceeded against.[*]
Some of the leading English cases will be adverted to, according to the order of time in which they were determined.
The case of The Neptune the Second, was decided two years after the passage of the statute of 52 George III. In that case Sir William Scott said: "If the mere fact of having a pilot on board and acting in obedience to his directions would discharge the owner from responsibility, I am of opinion that they would stand excused in the present case. I think it is sufficiently established in proof, that the master acted throughout in conformity to the directions of the pilot. But this I conceive is not the true rule of law. The parties *62 who suffer are entitled to have their remedy against the vessel that occasioned the damage, and are not under the necessity of looking to the pilot, from whom redress is not always to be had, for compensation. The owners are responsible to the injured party for the acts of the pilot, and they must be left to recover the amount, as well as they can, against him. It cannot be maintained that the circumstance of having a pilot on board, and acting in conformity to his directions, can operate as a discharge of the responsibility of the owners." The statute is not adverted to in the case.
In The Attorney-General v. Case,[*] it was held by the Court of Exchequer that the case was to be determined under the Liverpool Pilot Act, and that the statute containing the clause of exemption did not apply; that the vessel being at anchor, it was optional with the master to take a pilot or not, and that the vessel was therefore liable. It was strongly intimated that if she had been under way, and the pilot had been taken under the Liverpool Act, there would have been no such compulsion as, upon general principles, would have exonerated the vessel from responsibility.
In Caruthers v. Sidebotham,[] the Court of King's Bench held that the pilot was compulsorily taken, and that, independently of the statute giving the exemption, the vessel, upon general principles of municipal law, was not liable. The Attorney-General v. Case was referred to in the argument. The ruling of the court was in direct antagonism to the intimations in that case.
The Girolamo[] was decided by Sir John Nichol. He held, among other things, that the provision in the 6 George IV, that "the act should not affect or impair the jurisdiction of the High Court of Admiralty," limited the operation of the clause of exemption to proceedings in personam in the common law courts, and left the admiralty jurisdiction to be exercised in all respects as if the exemption in the statute had not been enacted. The judgment is a very elaborate *63 one. The vessel was held liable, although in charge of a licensed pilot at the time of the collision.
This case was followed by The Baron Holberg,[*] The Gladiator,[] and The Eolides[]  decided by the same judge in the same way.
So the English law stood until the decision by Dr. Lushington in the case of The Protector.[§] In that case the subject was examined with great care and fulness of research. The learned judge expressed the opinion that Sir William Scott had decided the case of The Neptune the Second in entire ignorance of the statute of 52 George III, ch. 39, and that the case, therefore, was not authority. He overruled the judgment of Sir John Nichol as to the effect of the jurisdiction clause of the statute, and held the true rule to be, that the statute took away the responsibility of the vessel whenever the accident was imputable to the fault of the pilot alone. The court found the fact so to be, and upon that ground dismissed the owner of the Protector from the suit.
In The Maria[] the subject was again ably examined by the same admiralty judge. It was held that under the Newcastle Pilot Act the taking of a pilot by a foreign ship was compulsory, and that if damage occurred to another vessel by his default, the vessel which had taken him was not liable, both upon general principles and by virtue of the act of 5 George IV, ch. 55. The rule laid down by the Court of King's Bench in Caruthers v. Sidebotham,[¶] was recognized and affirmed.
These judgments have stood unquestioned down to the present time. There have been numerous adjudications settling the construction of the statutory provision that the vessel shall be exonerated where the pilot is in fault.
The following propositions may be deduced from them:
The statute giving the immunity where a licensed pilot is employed, abridges the natural right of the injured party to compensation, and is therefore to be construed strictly.
*64 The exemption applies only where the pilot is actually in charge of the vessel, and solely in fault.
If there be anything which concurred with the fault of the pilot, in producing the accident, the exemption does not apply, and the vessel, master, and owners are liable.
The colliding vessel is in all cases primâ facie responsible.
The burden of proof rests upon the party claiming the benefit of the exemption. He must show affirmatively that the pilot was in fault, and that there was no fault on the part of the officers or crew, "which might have been in any degree conducive to the damage."[*]
The last in the series of these authorities, to be considered, is The Halley.[] The owners of a foreign ship sued the owners of an English ship in the British Court of Admiralty, claiming damages for a collision in Belgian waters. The defendants pleaded that by the Belgian law pilotage was compulsory. The plaintiffs replied, that by the same law the wrongdoing vessel was liable for the damages. The case turned upon the sufficiency of the latter proposition as an answer to the former.
Sir Robert Phillimore, following the case of Smith v. Condry, decided by this court,[] and other authorities to which he referred, held that the rights of the parties were governed by the law of the place of the tort. In the course of his learned and elaborate opinion, he said:
"The English legislature has thought it expedient that only certain persons, under certain restrictions, shall be allowed to act as pilots in British waters; and that it shall be compulsory upon all masters of ships to place the navigation of their vessel under the control of one of these licensed pilots. And the common law of England has ruled, that in such cases the natural responsibility of the owner of the vessel, for injuries done to the property or persons of others, *65 by the unskilful navigation of that vessel, shall cease, and be transferred to the pilot. This law holds, that the responsibility of the owner, for the acts of his servant, is founded upon the presumption that the owner chooses his servant, and gives him orders, which he is bound to obey; and that the acts of the servant, so far as the interests of third parties are concerned, must always be considered the acts of the owner. But no such presumptions, it is said, can exist in the case of compulsory pilotage, in which the State forces its own servant upon the owner, and, indeed, in some respects reverses the usual order of things on board ship, by rendering it incumbent on the master to obey the order of the pilot. But the considerations of domestic policy, which have created this peculiar law, are not founded on principles of universal law or natural justice. They are considerations of British policy, which apply to British waters and territory; but not Flushing waters, in which this collision took place... ... Lord Stowell's mind, furnished as it was with the principles of jurisprudence, rejected the argument for the immunity of the wrongdoing vessel... . I will frankly say, that it appears to me difficult to reconcile the claims of natural justice to the law which exempts the owner who has a licensed pilot on board, from all liabilities for the injuries done, by the bad navigation of the ship, to the property of an innocent owner... . No one acquainted with the working of this law, which exempts the wrongdoing vessel from liability in this court, can be ignorant that it is fruitful of injustice."
This survey of the English adjudications warrants several observations.
Lord Stowell, overlooking the statute, refused to recognize the principle of exemption. He held the "true rule of law" to be, that fault created liability, notwithstanding that the pilot was taken upon compulsion.
Sir John Nichol made a persistent effort to get rid of the statute by giving the jurisdiction clause a construction which annulled the operation of the exemption in the Admiralty Court.
Dr. Lushington and the Privy Council have held that the *66 exemption clause is to be strictly construed, and have given it a construction so narrow as greatly to limit its operation and impair its efficacy; while Sir Robert Phillimore pronounced its working in the Admiralty Court "fruitful of injustice," and more than intimates that it is contrary to the fundamental principles of natural right.
These results furnish little inducements to us to establish the principle in our jurisprudence.
The question is not a new one in this country. It arose as early as the year 1800, in Bussy v. Donaldson.[*] In that case the court said:
"The legislative regulations were not intended to alter or obliterate the principles of law, by which the owner of a vessel was previously responsible for the conduct of the pilot, but to secure in favor of every person  strangers as well as residents  trading to our port, a class of experienced, skilful, and honest mariners, to navigate their vessels safely up the bay and the river Delaware. The mere right of choice is, indeed, one, but not the only reason why the law in general makes the master responsible for the acts of his servant  and, in many cases where the responsibility is allowed to exist, the servant may not in fact be the choice of the master."
Williamson v. Pierce,[] Yates v. Brown,[] and Denison v. Seymour,[§] involved the same principle, and were decided in the same way.
In the case of The Creole, decided by Mr. Justice Grier, on the circuit, in the year 1853,[] the subject underwent a learned and thorough examination, both by counsel and the court. The result was the same as in Bussy v. Donaldson. It appears by that case, that Mr. Justice Wayne had ruled the point in the same way in his circuit. No American adjudication to the contrary has been brought to our attention.
The question is now, for the first time, presented in this court.
*67 The New York statute creates a system of pilotage regulations. It does not attempt, in terms, to give immunity to a wrongdoing vessel. Such a provision in a State law would present an important question, which, in this case, it is not necessary to consider.
The argument for the appellants proceeds upon the general legal principle that one shall not be liable for the tort of another imposed upon him by the law, and who is, therefore, not his servant or agent.[*]
The reasoning by which the application of this principle to the case before us is attempted to be maintained, is specious rather than solid. It is necessary that both outward and inward bound vessels, of the classes designated in the statute, should have pilots possessing full knowledge of the pilot grounds over which they are to be conducted. The statute seeks to supply this want, and to prevent, as far as possible, the evils likely to follow from ignorance or mistake as to the qualifications of those to be employed, by providing a body of trained and skilful seamen, at all times ready for the service, holding out to them sufficient inducements to prepare themselves for the discharge of their duties, and to pursue a business attended with so much of peril and hardship. The services of the pilot are as much for the benefit of the vessel and cargo as those of the captain and crew. His compensation comes from the same source as theirs. Like them he serves the owner and is paid by the owner. If there be any default on his part, the owner has the same remedies against him as against other delinquents on board. The difference between his relations and those of the master is one rather of form than substance. It is the duty of the master to interfere in cases of the pilot's intoxication or manifest incapacity, in cases of danger which he does not foresee, and in all cases of great necessity.[] The master has the same power to displace the pilot that he has to remove any *68 subordinate officer of the vessel. He may exercise it or not, according to his discretion.
The maritime law as to the position and powers of the master, and the responsibility of the vessel, is not derived from the civil law of master and servant, nor from the common law. It had its source in the commercial usages and jurisprudence of the middle ages. Originally, the primary liability was upon the vessel, and that of the owner was not personal, but merely incidental to his ownership, from which he was discharged either by the loss of the vessel or by abandoning it to the creditors. But while the law limited the creditor to this part of the owner's property, it gave him a lien or privilege against it in preference to other creditors.[*]
The maxim of the civil law  sic utere tuo ut non, ldas alienum  may, however, be fitly applied in such cases as the one before us. The remedy of the damaged vessel, if confined to the culpable pilot, would frequently be a mere delusion. He would often be unable to respond by payment  especially if the amount recovered were large. Thus, where the injury was the greatest, there would be the greatest danger of a failure of justice. According to the admiralty law, the collision impresses upon the wrongdoing vessel a maritime lien. This the vessel carries with it into whosesoever hands it may come. It is inchoate at the moment of the wrong, and must be perfected by subsequent proceedings. Unlike a common-law lien, possession is not necessary to its validity. It is rather in the nature of the hypothecation of the civil law. It is not indelible, but may be lost by laches or other circumstances.[]
The proposition of the appellants would blot out this important feature of the maritime code, and greatly impair the efficacy of the system. The appellees are seeking the fruit of their lien.
All port regulations are compulsory. The provisions of *69 the statute of New York are a part of the series within that category. A damaging vessel is no more excused because she was compelled to obey one than another. The only question in all such cases is, was she in fault? The appellants were bound to know the law. They cannot plead ignorance. The law of the place makes them liable. This ship was brought voluntarily within the sphere of its operation, and they cannot complain because it throws the loss upon them rather than upon the owners of the innocent vessel. We think the rule which works this result is a wise and salutary one, and we feel no disposition to disturb it.
The steamship is a foreign vessel. We have, therefore, considered the learned and able argument of the counsel for the appellants with more care than we should otherwise have deemed necessary. Maritime jurisprudence is a part of the law of nations. We have been impressed with the importance of its right administration in this case.
Mr. Justice CLIFFORD (with whom concurred Mr. Justice FIELD):
I concur in the proposition that the pilot laws of New York afford no defence to the appellants in this case, and that the decree of the Circuit Court, determining that the colliding steamship was liable, notwithstanding she had a licensed pilot on board, ought to be affirmed. Many English cases decide otherwise, but I am not satisfied with the reasons given in their support, and have no hesitation in concurring in the conclusion to which the majority of the court has come; but I do not concur in the proposition that the State laws which require inward or outward bound vessels to pay pilot fees or half pilot fees, whether they employ a pilot or not, would afford any such defence in a case of collision, even if it be admitted that a law imposing penalties, in case of a refusal to employ a licensed pilot, would have that effect. Whether the party charged is liable or not, aside from the merits, depends in all cases upon his relation to the wrongdoer. If the wrongful act was done by himself, or was occasioned by his negligence, of course he is *70 liable, and he is equally so, if the act constituting the fault was done by one towards whom he bore the relation of principal, but the liability ceases where the relation of principal entirely ceases to exist, as in case of inevitable accident. Unless the relation of principal entirely ceases to exist, the party owning the vessel remains liable in a suit in personam.
When a vessel is chartered, the liability of the owner, in respect to a collision happening in consequence of the faulty navigation of the ship, depends upon the inquiry whether or not the master and crew can be considered to be his servants. Settled rule is that where the ship-owner provides the vessel only, and the master and crew are selected by the charterer, the latter and not the ship-owner is responsible for their acts. But if the ship-owner provides not merely the vessel, but also selects the master and crew, he is still liable, in case of collision, to the owners of the injured vessel, because the vessel, in the sense of the maritime law, is under his control, though the wages of the master and crew may be paid by the charterer. Such liability in the former case is shifted from the real owner to the owner for the voyage; but the ship is as much liable in the one case as in the other to a suit in rem for the injury committed, because she sailed on the voyage as the property of the real owner and by his consent.
Port regulations are supposed to be known to the ship-owner before he sends his vessel on the voyage, and the rule of the maritime law is, that in sending her to any particular port he elects to submit to the lawful regulations established at that port, and that his vessel shall be responsible in case she unlawfully collides with another vessel engaged in lawful navigation. Contrary to the rule adopted in the English admiralty, the American courts have so held without an exception which has fallen under my observation.[*]
All of these cases decide that the State statutes requiring *71 the master to take a licensed pilot and making provision for the payment of pilot fees, do not amount to a compulsion to take a pilot, and I am satisfied they are correct, and that such a statute cannot be set up as exempting a ship from responsibility while navigated by a licensed pilot.
Believing those decisions to be correct, I cannot consent to pronounce them incorrect, especially as no such conclusion is necessary to the right disposition of the present case. Neither the common law courts nor the courts of admiralty, in this country, have adopted the rule established by Dr. Lushington. On the contrary, they all have held that the State laws requiring the master to pay pilot fees, whether he employed a pilot or not, did not compel him to surrender the navigation of his ship to the licensed pilot, or prevent him from continuing in the command of his ship. Dissenting as I do from the rule laid down in the English courts, I concur with the majority of the court in overruling those decisions as applied to our jurisprudence, but I cannot concur in overruling the American decisions which assert the opposite doctrine, because I believe they are correct.
DECREE AFFIRMED.
NOTES
[*] 1 W. Robinson, 95.
[*] The Druid, 1 W. Robinson, 399.
[*] 3 Price, 303.
[] 4 Maule & Se n. 78.
[] 3 Haggard, 169.
[*] 3 Haggard, 244.
[] 3 Ib. 340.
[] 3 Ib. 367.
[§] 1 W. Robinson, 45
[] 1 Ib. 95.
[¶] 4 Maule & Selwyn, 78.
[*] The Gen. De Caen, 1 Swabey, 10; The Diana, 1 W. Robinson, 135; The Protector, Ib. 60; The Christiana, 7 Moore, P.C. 171; The Minna, Law Rep. Ad. & Ecc. pt. 2, Nov. 1868, p. 97; The Iona, Law Reports, 1 Privy Council, 432.
[] Law Reports, 1868, pt. 2, Ad. & Ecc. p. 3
[] 1 Howard, 28.
[*] 4 Dallas, 206.
[] 4 Martin, N.S. 399.
[] 8 Pickering, 23.
[§] 9 Wendell, 1.
[] 2 Wallace, Jr., 485.
[*] Mulligan v. Wedge, 12 Adolphus & Ellis, 737; Redie v. Railway Company, 4 Exchequer, 244.
[] The Argo, 1 Swabey, 464; The Christiana, 7 Moore P.C. 192.
[*] The Phbe, Ware, 273; The Creole, 2 Wallace, Jr., 519.
[] The Bold Buccleugh, 7 Moore P.C. 284; Edwards v. The Steamer F. Stockton, Crabbe, 580; The American. 16 Law Reports, 264; The Lion, Law Rep., November, 1868, Ad. and Ecc. 107.
[*] The Carolus, 2 Curtis, 2269; The Hallock, 1 Sprague, 539; Bussy v. Donaldson, 4 Dallas, 206; Yates v. Brown, 8 Pickering, 23; Williamson v. Price, 4 Martin, N.S. 399; Dennison v. Seymour, 9 Wendell, 1; Smith v. Condrey, 1 Howard, 28; The Lotty, Olcott, 329; The Creole, 2 Wallace, Jr., 511; The Rescue, 2 Sprague, 16.