### THE GULF MARACAIBO.

### THE CARD.

### THE CARD BOYS.

### THE MARION OLSEN.

District Court, E. D. New York.
Aug. 12, 1947.

Libel by Mary B. Williams and another, copartners doing business under the firm name and style of Brigham Brothers, as owner of the scow Harry B. Rich, and as bailee of her cargo and on behalf of her master for the loss of his personal effects, against the tanker Gulf Maracaibo, Gulf Oil Company, claimant, tugs E. M. Card and Card Boys, Card Towing Line, Inc., claimant, and tug Marion Olsen, Olsen Water & Towing Company, Inc., claimant.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for libelants.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for the Gulf Maracaibo.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for the E. M. Card, the Card Boys, and the Marion Olsen.

KENNEDY, District Judge.

On the morning of February 12, 1944, S. S. Gulf Maracaibo[1] was moored, starboard side to, along the northerly face of Pier 3 at Erie Basin. At that time she was operating under a time charter to the War Shipping Administration. Card Towing Line, Inc. (hereafter called Card), had evidently been notified that Maracaibo was to be undocked that morning, and then to be towed to Pier 59, North River. The towing company supplied for the operation two of its own tugs (E. M. Card and Card Boys),[2] and also a tug owned by claimant Olsen Water and Towing Co., Inc., apparently chartered to Card Towing Line, Inc., namely, the Marion

---

[1] The S.S. Gulf Maracaibo is a vessel of 9,306 gross tons and 5,393 net tons, having a registered length of 488.8 feet, a breadth of 68.3 feet and a depth of 36.2 feet, and of 5,000 horsepower. At the times involved herein she had a draft of 8 feet 9 inches forward and 17 feet 9 inches aft.

[2] The steamtug E. M. Card is a vessel of 204 gross tons and 138 net tons, having a registered length of 96.0 feet, breadth of 26.5 feet and depth of 11.9 feet, with 600 horsepower. The steamtug Card Boys is a vessel of 183 gross tons, 92 net tons, having a registered length of 94.2 feet, breadth of 24.6 feet and depth of 13.2 feet, with 750 horsepower.

Olsen.[3] During the operation, libelants' scow Harry B. Rich[4] was sunk as the result of a collision with the stern of Gulf Maracaibo. Harry B. Rich was then moored, being the off shore scow in a tier of three which were made fast along the face of Pier B, Erie Basin. The libel is in rem against Gulf Maracaibo, E. M. Card, Card Boys and Marion Olsen.

The facts in the case are simple. The undocking operation was begun at about 11:00 A. M. on February 12, 1944. At that time the wind was westerly at a force of 24 miles per hour, a velocity which gradually increased as the operation progressed. On that morning Erie Basin was quite crowded. I have mentioned the tier of scows on the face of Pier B where the disaster occurred. A glance at the chart will show that vessels leaving Erie Basin must shape a west northwest course through a gap which opens into Red Hook Channel. A vessel holding this course passes on her starboard hand first the floating drydock, then Pier B, then Pier A, and last what is known as the elevator dock. On her port hand will be a breakwater, and on February 12, 1944, a number of ships were moored alongside its easterly face; a portion of one of these extended beyond the breakwater and about 15 or 20 feet into the gap itself. Probably there was also a ship moored at the end of Pier 5, which also reduced the room to maneuver.

One Ramsdale, master of Card Boys, was in charge of the operation. He boarded Gulf Maracaibo, and ordered Marion Olsen to take station on the ship's port (off shore) quarter. Card Boys was placed at the port bow of Gulf Maracaibo and E. M. Card at the end of Pier 3.

Maracaibo passed an 8 inch sisal hawser to Marion Olsen which the latter secured around her stern towing bitts; on Maracaibo the line was secured to a bitt on the ship's port quarter. Olsen then commenced to pull Maracaibo's stern in a westerly direction as far as she could. As soon as Maracaibo's bow was clear of Pier 3, Olsen turned to starboard. Meanwhile, the two Card tugs at Maracaibo's port bow pushed her around so that ultimately the ship was turned clockwise through about 220 degrees to put her on her course for the gap. It will be seen that by this operation the bow of the ship was turned through the eye of the wind, and that when she was steady on her course she had the wind on her port side, which naturally tended to set her down (to her own starboard) toward the end of Pier B. As Maracaibo passed the latter point, the stern hawser parted about 2 feet from the eye, which, as I have said, was around Olsen's stern towing bitt. The latter blew an alarm. Shortly afterward, Maracaibo's stern swung into the starboard side of libelant's scow. Maracaibo, meanwhile, under Ramsdale's direction, had been working her engines intermittently, and at the time of the collision she was backing. Her propeller tore a hole in the side of Harry B. Rich; the latter careened to starboard and sank. Just prior to the collision, E. M. Card had probably shifted her station from off Maracaibo's port side to the latter's starboard bow.

There can be no dispute that the damage to libelants' scow was caused in very large part by the propeller of Maracaibo, which at the time of, and subsequent to, the contact with the scow was working astern. At this time Maracaibo was in charge of the master of Card Boys. But the suit is purely in rem, and to me the liability of Maracaibo is clear, regardless of the legal relationship between her and the man at her wheel (The China, 1869, 74 U.S. 53, 7 Wall. 53, 19 L.Ed. 67), unless the disaster was the result of inevitable accident (which Maracaibo disclaims in her briefs) or was produced by fault on the part of an agency not at all controlled by Maracaibo, without any concurring negligence on her part. It is extremely doubtful that in dealing with Maracaibo's liability I should discuss the second alternative which I have just mentioned; beyond doubt, Maracaibo's propeller caused at least part of the damage, and

---

[3] The steamtug Marion Olsen is a vessel of 135 gross tons, 92 net tons, having a registered length of 91.1 feet, breadth of 22.0 feet and depth of 11.4 feet, with 350 horsepower.

[4] Harry B. Rich is 110 feet long and 33 feet wide.

it seems farfetched to say, in this situation, that Maracaibo could possibly be absolved, even if it could be shown clearly by proof on her part that she was brought into collision through no laxity on her part. Nevertheless, it is better that I should analyze her claim.

■ Maracaibo's real position seems to be that the failure of the hawser is merely a minor incident in an orgy of recklessness on the part of the tugs. It is urged by the tanker that the operation should not have been launched at all, because of the congested condition of the basin, or, if started, that more than three tugs should have been supplied. But, assuming that there was any evidence to support the charge that the undocking maneuver was reckless under the conditions existing at the time (and there is no such evidence),[5] still the liability on the part of the pilot in charge for carelessness in *beginning* the operation could not conceivably render any one of the tugs liable in rem. And that is the only type of liability here asserted. Moreover, there was in effect between Maracaibo's owners and the towing company a pilotage clause, the bearing of which will be considered at a later point. Even so, says Maracaibo, the incompetence of the tugs, and not the parting of the hawser, was the prime cause of the disaster.

Manifestly this charge does not lie either against the tug Card Boys or the tug E. M. Card. The former was stationed on the port bow of Maracaibo at the time of the collision, and probably E. M. Card was on the ship's starboard bow. (Concerning the latter tug, this is the testimony of the pilot in charge of Maracaibo, although it is possible that he is mistaken.) At any rate, both of these tugs were carrying out their orders, presumably directing Maracaibo's bow toward the gap, and controlling her against the action of the wind. The argument of Maracaibo, therefore, resolves itself into the contention that these tugs, stationed at the bow, should, without an order from the pilot in charge, have done something to hold Maracaibo off the scows at the end of Pier B. Passing the question of whether it is proper for a tug under directions from the bridge of a towed vessel to leave station without an order, I cannot see what either of them could have done if they had. For either tug to leave its station would have been to lose or weaken control of the bow of Maracaibo. To swing the bow away from Pier B would have been to enhance the damage by pivoting the ship, and bringing her stern into more violent contact with vessels moored to starboard. And so I feel that I must exonerate both Card Boys and E. M. Card, without further discussion.

■ This leaves open the question whether, despite the parting of the hawser, the disaster was produced by the misconduct of Marion Olsen. I have said that initially the tug last mentioned was assigned to the task of hauling Maracaibo stern first out of her berth, and that as soon as Maracaibo's stern had cleared the corner of the pier, the ship was shoved around clockwise through 220 degrees by the tugs Card Boys and E. M. Card. When Maracaibo was straightened up toward the gap, Marion Olsen was astern of her, the hawser which eventually parted leading from the port quarter of Maracaibo to the stern bitts of Olsen. The record is by no means clear what Marion Olsen did thereafter; what little evidence there is indicates that she must have rounded to and taken station on the port quarter of Maracaibo, evidently with the object of hauling Maracaibo's stern up into the wind, and thus keeping it clear of the pier heads and scows on Maracaibo's starboard side. At this juncture the hawser parted. It is clear that the next maneuver of Marion Olsen was to come up alongside of Maracaibo and make fast her own headline, probably to Maracaibo's port quarter. But at least four minutes elapsed between the parting of the original hawser and the time when what remained of it had been hauled in by Maracaibo's people.[6]

---

[5] The mate of Maracaibo does make the suggestion that it would have been wiser to have supplied a fourth tug. But he was not a witness qualified to testify on the point. On the whole record, I believe that the operation was reasonably safe when undertaken, and in all likelihood would have succeeded had the hawser not parted.

[6] Maracaibo's bell book seems to show that an alarm was sounded by Marion Olsen at 11:40 A.M. whereupon Maracai--

Giving Maracaibo's argument the benefit of every doubt, it is to the effect that, as soon as the hawser parted, Marion Olsen, instead of standing by to replace it, should have circled under Maracaibo's stern, come up against her starboard quarter, and in this way shoved her stern out, away from the pier heads and scows. With the benefit of knowledge after acquired, it is possible to say that the replacement of the hawser was a futile effort, and that Marion Olsen might have been successful in averting the disaster had she elected the highly risky maneuver of interposing herself between Maracaibo and the pier head, while the former was being swept down by a 40-mile breeze. But I doubt that an election on Marion Olsen's part to make what later proved to be a futile maneuver can be characterized as bad navigation, amounting to a fault, in these circumstances at least. At worst, and on the assumption that Marion Olsen became a free agent when the hawser parted (free to take station where she liked although she had just been acting under the orders of a pilot in general charge), her conduct was no more than wrong judgment in extremis. If I am right in all this, I must acquit Marion Olsen.

It may be that a reviewing court will not appraise the situation, as I do, and will attach some measure of blame to one or more of the tugs. On the supposition that this may happen, it is necessary for me to consider a collateral controversy, arising from the nature of the contractual relation between Card and Maracaibo's owners. Prior to February 12, 1944, there can be no doubt that Card enjoyed whatever benefits arose from a pilotage clause substantially the same as that interpreted in Sun Oil Co. v. Dalzell Towing Co., 1932, 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311. However, towards the close of 1943, towers had begun to press for an exemption broader than that conferred by the pilotage clauses under which they were then operating. And the War Shipping Administration assented to this, apparently on condition that rates be reduced by an additional discount in the amount of 5%. Under the proposed change in the contracts, the owners of a ship with motive power would be compelled to adopt as their servants not only the tugboat captain on the bridge of the ship but also the masters and crews of tugs assisting in the operation. Card called to the attention of Maracaibo's owners its desire to make this and other changes in the contract on December 30, 1943, but received no reply to the proposal. And so, in a letter dated February 11, 1944, the very day before the disaster here involved, Card notified Maracaibo's owners that it would accept no more engagements except under the newly proposed arrangement. This notification was, as I have said, in writing, and was undoubtedly received on the morning of February 12, 1944, which happened to be a holiday (Lincoln's Birthday). Unfortunately, the record does not show exactly when or how Maracaibo's owners called upon Card to undock Maracaibo on February 12th. It seems likely that the arrangement must have been made on or prior to February 11th, rather than on February 12th, and, if so, it was made prior to the receipt of Card's new offer. But even if the proposal, or ultimatum, was actually prior to the time when the undocking of Maracaibo was requested, it is very unlikely that anyone in the offices of the Towing Company anticipated or intended that this operation would be under the new arrangement. In fact, on February 17, 1944, the owners of Maracaibo rejected the proposal of February 11, 1944. But Card also relies upon the fact that on April 15, 1944, Maracaibo's owners took the benefit of the 5% discount on outstanding bills for operations, which included among others the undocking of Maracaibo on February 12, 1944. This Card considers an admission that the new arrangement was in force, or perhaps a belated acceptance, retroactive, of the proposal which is dated February 11, 1944.

Of course, the significance of all this is that if the new arrangement was in force on February 12, 1944, according to the contention of Card, it makes no difference whether any one of the tugs assisting in the operation, including Marion Olsen,

---

bo's engines were stopped and remained so until 11:44, at which time they were apparently set ahead slow for less than a minute, were stopped, and then put in reverse. The disaster occurred at 11:48 while Maracaibo's engines were working astern.

might have been guilty of negligence. The contract, says Card, by making the masters and crews of these tugs the ad hoc servants of Maracaibo's owners is a complete defense even where each vessel is sued in a proceeding in rem brought by a stranger to the agreement.

Were it necessary for me to decide whether the new contract had been accepted, or ratified, I would, on the scanty evidence before me, decide that it had not, that there was no act of acceptance, verbal or otherwise, on February 12, 1944, and that the acceptance of the discount by Maracaibo's owners on April 15, 1944, did not change this situation. To prove the existence of the new contract was certainly the burden of Card. The drastic character of the exemption claimed, assuming it to be valid and to be operative in suits by third parties,[7] leads me to believe that Card did not sustain this burden. But since I have found no blame on the part of any of the tugs, my views on this point are inserted merely for whatever they may be worth, if anything, to a court of review.

■ A point is made by Maracaibo that libellants' scow was at fault, because, moored as she was, she obstructed traffic in the basin. I can see no basis for any such finding, except possibly the happening of the collision, and I do not believe that the scow's position was even a remote cause of the disaster.

Libelants are entitled to a decree with costs holding Maracaibo and her owners solely responsible for the damage to the scow. The tugs Card Boys, E. M. Card and Marion Olsen and their owners-claimants are entitled to a decree dismissing the libel on the merits without costs.

I have filed findings of fact and conclusions of law.

Submit decree.

---

[7] I may as well say that it is difficult for me to follow the argument that a pilotage clause or "assistance clause," such as Card proposed on February 11, 1944, could render a ship liable in rem to a stranger to the contract for damage inflicted by helper tugs, also sued in rem.