**Frank MATTINA and Pearl Mattina, Plaintiffs,**

**v.**

**COMMERCIAL CABLE COMPANY, Ltd., Defendant.**

**Civ. A. No. 13108.**

United States District Court
E. D. New York.

Jan. 26, 1956.

Charles I. Pearson, New York City, A. Harold Frost, New York City, of counsel, for plaintiffs.

Burlingham, Hupper & Kennedy, New York City, by Eugene Underwood, H. Barton Williams, New York City, and Francis I. Fallon, Scarsdale, of counsel, for defendant.

GALSTON, District Judge.

This action was removed from the State Supreme Court, County of Kings, on the petition of the defendant. The action was tried without a jury. Originally the Commercial Cable Co., Inc. was also a party defendant, but by stipulation of December 8, 1952 the action was discontinued against that defendant.

The complaint sets forth that on August 9, 1952, at about 9:45 A.M., the plaintiff Frank Mattina was engaged in fishing on a fishing boat owned by the coplaintiff, his wife, off Rockaway Point, and that he sustained personal injuries when the defendant, through the operation of its vessel, the John W. Mackay, struck the fishing boat.

A second cause of action is alleged on behalf of Pearl Mattina as the owner of the boat for damage caused to her fishing boat as a result of having been struck by the John W. Mackay.

The answer denies liability, and alleges that it was the negligence of the plaintiffs that brought about the collision.

The John W. Mackay was a cable repair ship. She had sailed from Halifax, N. S. on her way to Rockaway Inlet, and had left Quarantine Anchorage in New York Harbor that morning. The navigation was in charge of Captain Julius H. Seeth, a Sandy Hook pilot.

On the morning in question, Frank Mattina, with his brother Tom Mattina, and a friend since deceased, went fishing in a fishing boat twenty-six feet in length, owned by Pearl Mattina. They arrived at a body of water known as Tin Can Fishing Grounds and anchored there. Apparently they were there for an hour and a half before the accident occurred.

It seems undisputed that that area was used by a great number of fishing vessels as a fishing ground.

It is the contention of the plaintiffs that the defendant had full knowledge of the presence of these numerous fishing craft anchored between Buoy 2 A in Ambrose Channel and Rockaway Inlet, but nevertheless deliberately proceeded along a dangerous course into the path of these anchored fishing craft. Also

the plaintiffs contend that the Mackay did not afford the plaintiffs adequate and sufficient warning of her presence in the fishing area. The defendant, on the other hand, contends that the plaintiffs were at fault for a number of reasons: first, for anchoring in the Channel; secondly for failing to keep a lookout, and finally that the defendant is not liable for the negligence, if any, of the New York State pilot.

The evidence establishes the anchored position of the Mattina boat. It was in the Channel, near the Rockaway Bell Buoy marking the Channel. The authorities warrant the conclusion that this area in the Rockaway Inlet was indeed a channel. The Oliver, D.C., 22 F. 838.

Seeth, the pilot, testified:

"Q. Now, Captain Seeth, what kind of traffic plies the waters from the Ambrose Channel into Rockaway Inlet, as you observe it? A. Well, almost daily there is a sludgeboat that goes into Rockaway and takes the sludge from the basin at the end of the sewer, through the settling basin, and takes it out to sea and dumps it. That is almost daily.

"Once a year we have a cable boat from either the United States Cable or British Cable or French Cable, there is a cable boat called the Edward Jerry Mackay that also goes in there, and they work on the cables inside of Rockaway.

"Q. What other kind of sizeable traffic do you see going in there? A. Well, there are tankers, gasoline tankers and fuel oil tankers which go in there.

"Q. How often do you see them? A. Almost daily.

"Q. Does this apply, by the way, to August 1952, to the year 1952? A. Yes it does."

Title 33 U.S.C.A. § 409, recites that

"It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft."

See Strout v. Foster, 1 How. 89, 42 U.S. 89, 11 L.Ed. 58; The Bern, 2 Cir., 255 F. 325; The John H. Starin, 2 Cir., 122 F. 236. The burden is on the unlawfully anchored vesel to show that her position did not bring about the accident.

Title 33, section 471, authorizes the Secretary of War to define and establish anchorage grounds for vessels in all harbors, rivers, bays and other navigable waters of the United States whenever it is manifest to the Secretary that the maritime or commercial interests of the United States require such anchorage grounds for safe navigation. Such anchorage grounds were established for the New York Harbor area which includes the Rockaway Inlet area in 33 C.F.R., section 202.155. In part that section provides:

"L. General Regulations (1). Except in cases of great emergency no vessel shall be anchored in the navigable waters of the port of New York outside of the anchorage areas established in this section * *"."

The record does not reveal that an anchorage area was established in the near vicinity of Rockaway Inlet, pursuant to the foregoing authority vested in the Secretary of War, so it would appear that the defendant properly contends that the Mattina boat was negligent in violation not only of the statute, 33 U.S.C.A. § 409, but also of the Anchorage Regulations for New York Harbor. The Vera, D.C., 224 F. 998. See also The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed 148.

As the cable ship proceeded in the Channel, repeated and almost continuous whistles were sounded by her for the purpose of warning the craft in her path. Many of these vessels responded by getting out of the Channel. Among the few that did not was the plaintiff's boat. Mattina testified that he did not hear her whistles. A proper lookout certainly would have been in position to get the warning, but instead all three men on the Mattina boat were busy catching fish and apparently ignored the whistles.

So again negligence would follow from a violation of 33 U.S.C.A. § 221, relating to the Inland Rules for Prevention of Collisions. The rule provides:

> "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences * * * of any neglect to keep a proper lookout".

The anchor could have been weighed in, the engine started and the boat moved, or as Captain Hunter of the cable ship testified:

> "Q. Was any attempt made to communicate with Mattina's boat by voice? A. I shouted myself to him to slip his—no, I think I said 'cut'; to cut his rope.
>
> "Q. Did anybody else shout that you recall? A. The chief officer shouted from the bow to get out of the way."

Hunter testified that the steering was difficult. They had to weave in and out on a zigzag course. They slackened speed. The only thing the Mattina boat did was to slack away its anchor rope.

Another item which cannot be overlooked is that the captain testified that it would not have been safe or prudent to reduce the speed more than was done because of the strong flood tide. He said: "We would have been swept on to the shoal water on our left-hand side." Nor could the cable ship have anchored with safety. Seeth, the pilot, said:

> "No, we were in a cable area and the ship, the cable boat that I was aboard of, was going in to repair cable that somebody else had already damaged by anchoring on it."

That too was the opinion of Captain Hunter.

Finally it must be observed that if any act of negligence was committed it was not by the captain or his crew. The negligence would be charged to the pilot. As a matter of law, this action being in personam, defendant is not liable for any negligence of the New York State pilot, though, as I have observed, I do not find that negligence can be charged even to him. The pilot was in command of the speed and course and the pilot gave the orders. The pilot was acting as required by the law of the State of New York Navigation Law, McK.Consol.Laws, c. 37, § 88. So far as the defendant is concerned, Seeth was a compulsory pilot, and the defendant did not participate in the selection of the pilot. The defendant is not responsible in personam for his acts, The China, 7 Wall. 53, 74 U.S. 53, 19 L.Ed. 67; New York Dock Co. v. New York & Cuba Mail S.S. Co., 259 N.Y. 606, 182 N.E. 200. Indeed the pilot had the right to believe that the Mattina boat would in the circumstances act to avoid danger, The Victory (The Plymothian), 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519.

The complaint will be dismissed, and in this view of the case it becomes unnecessary to make any findings in respect to the issue of damages.

Concurrently with this opinion appropriate findings of fact and conclusions of law will be filed.