EMPRESSA HONDURENA de
VAPORES, S.A., Plaintiff,

v.

The BANK LINE LIMITED and M/V
CLYDEBANK, her engines,
etc., Defendant.

No. 75 Civ. 4063.

United States District Court,
S. D. New York.

July 20, 1977.

Burlingham, Underwood & Lord, New York City, plaintiff; Robert B. Pohl, Terry L. Stoltz, New York City, of counsel.

Dougherty, Ryan, Mahoney, Pellegrino & Giuffra, New York City, for defendant; Robert J. Giuffra, James E. Ryan, New York City, of counsel.

IRVING BEN COOPER, District Judge.

This litigation arises from the collision of two vessels, the S/S Tenadores and the M/V Clydebank, on December 8, 1974 in the Balboa anchorage off the Panama Canal. The matter was tried to the Court over a period of two days. The following narrative constitutes our findings of fact.

During the early evening of December 8, 1974, plaintiff's vessel, the Tenadores, a cargo vessel 451 feet long and driven by steam (Tr. 5)[1].[2] entered the Balboa anchorage on the southern side of the Panama Canal. At the time, and for all relevant times hereafter up to the collision, it was still light outside though the sun had set (C.Z. Invest. 14).[2] The weather was clear, slightly cloudy, visibility good (C.Z. Invest. 6). The sea was calm (Tr. 24).

Aboard the Tenadores, its Captain, David Stewart, was the only lookout. He testified: "Q. During the period of time the vessel was making the maneuver, this left-hand turn, were you acting as the sole lookout of your vessel? A. As it happens I was, yes." (Tr. 92) To take weigh off the Tenadores and to slow her down, a complete circle to port was ordered just before she entered the anchorage. Captain David Stewart so testified:

As I approached the position where this ship designated at North 12 was anchored, as I expected, he came out towards the channel entrance buoys and I put the wheel of the Tenadores over to port and further took the weigh off her with stand movant, as I have done in the bell book, 17:48 and 17:51.[3]

Now, the North 12 was proceeding over to the channel buoys and I was proceeding over into the anchorage. I didn't want to pass ahead of him. . .. So with this in mind I had the wheel hard aport and at 17:52 I put the engines on half ahead. Then at 17:55 I put the engines on full ahead to tighten the turn and come around like they say to go to the anchorage. (Tr. 27–28).

At about this time, the defendant's vessel, the Clydebank, a cargo vessel of 11,200 tons gross and 530 feet long, powered by diesel engines, had taken pilots aboard and was preparing to get underway to transit the Canal (Tr. 141, 146).

As quoted above, the Tenadores was moving full ahead as it came out of its complete turn at about 1755 (Tr. 28). The Clydebank was not exhibiting the required navigation lights though it had gotten underway at this time. Captain David Stewart: "He had no running lights on, no navigation lights were showing." (Tr. 29) However, the Clydebank was correctly displaying the flags required to show it had a pilot aboard and was about to undertake a transit of the Canal:

Q . . . . Did the vessel [Clydebank], prior to the pilot coming on board, have any flags?

A She did.

Q What flag did it have?

A She had the Flag G.

Q What does that signify?

A "I require pilot."

Q When the pilot boarded the vessel at 5:34 [pm] what happened to that flag?

A It was taken down.

Q Was it replaced by anything else?

A It was.

Q What was it replaced by?

THE COURT: When was it taken down, Captain? When was Flag G taken down?

1. Tr.: Transcript of Trial Testimony

2. C.Z. Invest.: Transcript of Investigation by Board of Local Inspectors Canal Zone

3. Times are expressed on a 24 hour basis.

THE WITNESS: It was taken down about approximately, I would say, one minute after the pilot boarded.

THE COURT: Thank you, Captain.

Q At this point, Captain, was another flag raised?

A It was.

Q What flag was raised at that time?

A It was 3 over H; the numeral 3 over H.

Q What does that signify, Captain?

A It is a Panama Canal recognition signal.

Q Tell us the time that that went on.

A 1936, approximately. Beg your pardon, 1736.

Q About 2 minutes after the pilot came on board?

A Yes. [Donald Stewart] (Tr. 147–148)

Captain David Stewart, believing the Clydebank to be stationary in the water, steadied his ship, the Tenadores, to pass northwest of the Clydebank and to proceed to an anchorage generally north of where the Clydebank was situated. It was his testimony:

> So I concluded that he was still at anchor, and I turned the Tenadores into a line and steadied up on a line to go between the two ships, a little more toward the ship which was anchored to the north than the Clydebank. (Tr. 29)

At or about this time, Chief Officer Haylock of the Tenadores informed his Captain that the Clydebank's navigational lights had been turned on and that she was underway. His testimony:

> I told the captain, that on the starboard side the ship was underway. The first thing I notice: [sic] that she had put on her navigation lights.

Tenadores' log for December 8, 1974 indicates that the Clydebank was observed as moving at 1758. The Captain of the Tenadores thereupon ordered his vessel's speed to slow ahead from full ahead (C.Z. Invest.

55). The Clydebank and Tenadores were at this time about four-tenths of a mile apart (C.Z. Invest. 73) and on course at right angles to each other (C.Z. Invest. 7). Thus a crossing situation was presented with the Tenadores being the burdened or "givingway" vessel as it was to the port of Clydebank's bow (Tr. 68, 164).

During the period from when the Clydebank got underway to right before the collision, the Clydebank was being conned by Captain Warner, a Panama Canal Pilot. A trainee pilot was on the bridge at the time but did not assist in the vessel's maneuvering.[4] At 1800 the pilot aboard the Clydebank felt that the Tenadores was not doing enough to avert a possible collision. Captain Warner's testimony: "[T]he ship approaching on the port bow, on a steady approaching bearing, was getting in a position where I felt that he was not taking enough action" (C.Z. Invest. 5). Consequently, the pilot ordered the Clydebank to go dead slow and hard astarboard and he gave one blast on the whistle (Tr. 185). The Tenadores continued to come on at slow ahead until 1802 when, belatedly, her Captain ordered the wheel hard to port, the engines to stop, to go full astern and he gave three blasts on the whistle (Tenadores' Log, *supra.*) We have it from Captain David Stewart:

> I saw . . . the Clydebank. He was showing a port side light, two white navigation lights, and he was about a quarter of a mile away, 1½ points abaft my starboard beam, and I was about 3 points on his port bow.
>
> I took a quick look at the situation and I decided that if I stopped the Tenadores and took the weight off her he would have sufficient room to pass a couple of ship lengths, perhaps, ahead of me, and I therefore put the wheel hard aport to counteract any swing that would be caused by the stand movement of the

---

4. Q Captain [Donald Stewart], what was the training pilot doing at 5:34 [pm]?

A Observing.

Q At any time did he take over the control of the vessel or give any orders?

A No, sir. (Tr. 156–157; see also C.Z. Invest. 23, 78)

engines. I put the wheel hard aport. I told the mate to stop the engines and then put them full astern. I walked into the wheel house to check to make sure that the wheel was hard to port. It was hard to port. By the indicator I watched the engine room revolutions counter going into the stand area, and then walked back onto the starboard wing of the bridge and gave three blasts on the Tenadores' whistle. The three blasts mean my engines are going full astern. . . .

I reached over into the telegraph and I pumped the handle up and down to call for an emergency full astern, which would mean that I would get the response a little more quickly than just a direct full astern. . . . (Tr. 31–33)

After the Captain of the Tenadores ordered emergency full astern, the Clydebank was only two to three ship lengths away (Tr. 33).

At or slightly before 1802, the pilot of the Clydebank ordered her engines to stop immediately; the pilot then ordered full astern, double jingle (C.Z. Invest. 5). As with the Tenadores, the Clydebank blew three whistles to indicate she was going astern (C.Z. Invest. 19). The Captain of the Clydebank then ordered her engines to emergency full astern (Tr. 184) and, immediately prior to the collision, relayed Captain Warner's order to let go of the anchor at the bow (C.Z. Invest. 16). Captain Donald Stewart testified:

Prior to the actual contact, when Captain Warner said, "Let go the anchor," I phoned the chief officer and said, "Let go the anchor and then get the hell off the forecastle . . .."

Notwithstanding the orders and actions of both vessels, they collided at about 1803 with the stem of the Clydebank striking the starboard side of the Tenadores between her number one and two hatches (C.Z. Invest. 7).

### Issues

The issues to be resolved are as follows: (a) Was the collision between the Tenadores and the Clydebank caused by negligence of:

(i) the Tenadores, (ii) Panama Canal Company Pilot on board the Clydebank; (iii) the Clydebank; (iv) the fault of any or all or any combination of those listed in (i), (ii) and (iii).

(b) If the court finds the Panama Canal Company at fault, is that fault to be attributed to the Clydebank?

(c) If the court finds fault of more than one of the parties, in what proportion should damages be divided?

### Conclusions

After a thorough examination of all the evidence, including the transcript of testimony before the Board of Local Inspectors of the Canal Zone, we find plaintiff Empressa Hondurena de Vapores, the owner of the Tenadores, to be 70% at fault; the defendants Bank Line Limited and M/V Clydebank to be 30% at fault. As the pilot was not a party to this proceeding, we make no separate finding as to the extent of his fault. However, we do find that the defendant M/V Clydebank is liable *in rem* for the negligence or faults of the pilots aboard the Clydebank at the time. It does not matter that his presence was compulsory. It has been clearly established since *The China,* 7 Wall. 53, 74 U.S. 53, 19 L.Ed. 67 (1863) that the ship is liable *in rem* for the faults of a compulsory pilot. In *People of the State of California v. Italian Motorship Ilice,* 534 F.2d 836 (9th Cir. 1976), the court stated:

[T]hat, notwithstanding personal non-liability of the ship owner in such a case, the ship itself remains liable in rem for damages arising out of a collision due to the pilot's negligence—even though the use of the pilot is compulsory (p. 841).

As it is stipulated by the parties that the plaintiff acquired *in rem* jurisdiction over the Clydebank (Ex. 14—Stipulation X), *in rem* liability lies for the negligence of the pilot against defendant M/V Clydebank.

The doctrine enunciated in *U. S. v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), is clear authority for

the allocation of liability in this instant litigation. See *Getty Oil Co. v. S/S Ponce de Leon,* 555 F.2d 328 (2d Cir. decided May 16, 1977). As Mr. Justice Stewart stated for a unanimous Court in *Reliable Transfer* (Id., 421 U.S. at p. 411, 95 S.Ct. at p. 1715):

> We hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damages is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of fault.

We find that the Tenadores and the Clyde-bank were not equally at fault; also, that it is possible to measure fairly the comparative degree of fault of both parties (the issue of relative fault is constantly being resolved by juries as well).

We find that the excessive speed of the Tenadores upon entering the Balboa anchorage, its failure to maintain an adequate number of lookouts, and its failure to timely slow, stop and reverse its engines substantially contributed to the collision. We also find that the Clydebank was at fault, though to a considerably lesser degree than the Tenadores, by its failure to promptly indicate by signals that it was underway at the earliest possible opportunity, and by its failure to take timely evasive action when it was apparent that the Tenadores could not avert the collision by its acts alone.

■ The Clydebank was the privileged vessel in the crossing situation presented by the Tenadores' course. Rule 19 of the International Regulations for Preventing Collisions at Sea ["International"] (33 U.S.C. § 1081). As burdened vessel, the Tenadores was obliged to take the necessary steps to avert the collision with the Clydebank. *Sawyer v. McDonald,* 165 F.2d 426 (5th Cir. 1948); *Tidewater Associated Oil Co. v. U. S.,* 60 F.Supp. 376 (D.C.Cal.1945). By International Rule 22 (33 U.S.C. § 1084), the Tenadores was enjoined to take positive action to avoid the collision and not pass

ahead of the Clydebank. *The Queen Elizabeth,* 122 F. 406, 59 C.C.A. 345 (2d Cir.); *cert. denied,* 190 U.S. 560, 23 S.Ct. 855, 47 L.Ed. 1184 (1903). The Tenadores had a duty to keep out of the Clydebank's way and, upon approaching her, to slacken her speed or stop or reverse by International Rule 23 (33 U.S.C. § 1085). *Oriental Trading & Transport Co. v. Gulf Oil Corp.,* 173 F.2d 108 (2d Cir. 1949); *cert. denied,* 337 U.S. 919, 69 S.Ct. 1162, 93 L.Ed. 1728 (1949). The Captains of both vessels recognized the crossing situation and that the Clydebank was the privileged vessel entitled to hold its course and speed (Tr. 68, 111, 161).

■ Indeed, as a steam vessel and therefore slow to stop and reverse (Tr. 239), the Tenadores should have stopped at 1758 when the crossing situation was brought to Captain David Stewart's attention:

> The lesson that steam vessels must stop their engines in the presence of danger, or even of anticipated danger, is a hard one to learn, but the failure to do so has been the cause of the condemnation of so many vessels that it would seem that these repeated admonitions must ultimately have some effect. *The New York,* 175 U.S. 187, 207, 20 S.Ct. 67, 75, 44 L.Ed. 126 (1899).

The uncontradicted testimony from William Ash, the naval expert called by the defendants, is clear on this point:

> A diesel engine vessel is like a big internal combustion engine. . . . they respond to a throttle with instant action. . . . the response is prompt, whereas in a steam engine if it is a turbine, either low pressure or high pressure, you have an entirely different problem. You can't apply the breaks [sic] to your high speed turbines and in slowing them down and putting the thrust on your propeller shaft, the vessel still maintains the ahead turning until it comes to a stop before you can reverse it. You do not get the prompt sudden action that you get from a diesel.
>
> Also, it is very factual that in a diesel engine you get almost as much astern power as you do ahead power, whereas in

your turbine you have a reversing turbine which is smaller and doesn't give you the instant or prompt turbine action you would get from the diesel action. (Tr. 240–241)

The failure of the Tenadores to stop and reverse engines promptly upon sighting the Clydebank at 1758 constituted careless navigation which we find significantly contributed to the collision.

 Undoubtedly, Captain David Stewart was preoccupied with his vessel's navigation and was not alert to the Clydebank getting underway and turning on its navigation lights. Hence, the Tenadores was in clear violation of International Rule 29 (33 U.S.C. § 1091) which requires a vessel to keep a proper lookout. Obviously, a captain, burdened with other duties, is an improper lookout. *The Pallanza,* 189 F. 43 (2d Cir. 1911); *Moran Towing v. U. S.,* 80 F.Supp. 623 (S.D.N.Y.1948); *The Corozal,* 62 F.Supp. 123 (S.D.N.Y., 1945). As we noted in our findings of fact, Captain Stewart was the sole lookout of the Tenadores when it entered the anchorage. His testimony is replete with indications that he was preoccupied with the immediate navigation of his ship and not looking out for dangers looming distantly and in the future. He testified:

[As the Tenadores entered the Balboa anchorage] I took the binoculars and I had a look at the other vessels in anchorage. I observed a ship coming southbound in the channel up about Buoy 12. He was too far away to pose any problem. There was a small vessel coming in there, a tuna fisherman coming in from seaward. He was no problem. I looked at the other ships in the anchorage and none of them had changed their position at all. The ship which was North 12 had proceeded further up towards the entrance buoys and the only one which posed any problem to me would have been the Clydebank. . . . While watching the [Clydebank] he disappeared from sight. He was about 5 or 6 points from the starboard bow. At this point I watched until he disappeared behind a Samson post which is just outside the—on

the outside [of] the wheelhouse door on the port deck of the Tenadores. . . . when he disappeared behind this and I went out onto the port wing to have a look at the ship under whose stern I was going to pass. (Tr. 30–31)

From the preceding, it is apparent that keeping track of all vessels in the Balboa anchorage would have been an onerous task even for one whose sole responsibility was lookout. The proof that the Captain of the Tenadores could not be an adequate lookout is contained in the fact that the movement of the Clydebank was first spotted by the Tenadores' Chief Officer and not by the Captain.

We reject as incredible Captain Stewart's testimony that shortly before the collision, the Clydebank blew two blasts and altered course to port and headed into the Tenadores (Tr. 33). This allegation is only supported by testimony from the crew of the Tenadores and flatly rejected by Captain Warner, the pilot, and Captain Donald Stewart of the Clydebank:

Q Captain [Stewart], based on your professional experience and opinion, could your vessel have turned to port at that particular time?

A No, sir.

Q Why not, Captain?

A It would be heading directly into danger.

Both Captain Warner and Captain Donald Stewart were at the time of the collision, master mariners with long years of experience in piloting vessels like the Clydebank. If either directed the helmsman to turn to port at the crucial moments before the collision, it is a certainty that the other would have instantly countermanded the order before it could be executed.

In some critical respects, the Clydebank's handling contributed to the collision. At 1758, when the Tenadores first spotted the Clydebank, it was traveling at full ahead. To the observation of those aboard the Clydebank, the Tenadores did not appear to slacken her engines and reverse herself un-

til several minutes after 1758.[5] Therefore, though it was the privileged vessel, the Clydebank, as required by International Rule 21 (33 U.S.C. § 1083), should have acted sooner and with greater dispatch to stop and reverse herself when it became apparent that the Tenadores had failed to take steps to avoid the onrushing collision. *Standard Oil Co. v. N. J. v. U. S.,* 92 F.Supp. 696 (S.D.N.Y.1950); *The Gulfstar,* 42 F.Supp. 440 (E.D.Pa.), *aff'd,* 136 F.2d 461 (3d Cir. 1940); *The Benalla,* 45 F.2d 864 (S.D.N.Y.1921). In *Benalla* the court held that the privileged vessel (in a crossing situation), which delayed one minute between stopping and reversing engines, was at fault:

> The most unquestioned fault, to my mind, of the Benalla is in the fact that when she determined to act, she did not act properly. I refer to the fact that for an interval of a minute, she stopped her engines and did not reverse. If she had done so at once, the collision would not have happened. As it was, she was nearly stopped in the water and the Dalzell all but crossed her bow. Had she reversed for two minutes instead of one, it is all but demonstrable she would not have hit at all (pp. 865–866).

In delaying so long to take action, the pilot placed both vessels in a situation where later heroics, perforce desperate and last-minute, could not have averted the collision. The pilot acknowledged that by the time he decided to take action, the Clydebank, a heavy vessel and then moving very slow, could not alone avoid the collision (C.Z. Invest. 7). Had the Clydebank went full astern at 1801, she would have stopped before the point of the collision as her Captain admitted (Tr. 196).

Additionally, the Clydebank was at fault for failing to turn her navigation lights on immediately as it got underway. International Rule 1(b) (33 U.S.C. § 1061(b)) required the Clydebank to display her navigation lights when she began moving at 1754

as the sun had set at about 1730 (Tr. 141, 208). See *Merritt-Chapman & Scott Corp. v. Cornell Steamship Co.,* 265 F.2d 537, 539 (2d Cir. 1959). Certainly, there is a good likelihood that the Tenadores would have been alerted to the Clydebank being underway had it lit its navigation lights when it got underway (Tr. 49, 67, 79). The master of the Clydebank was also at fault for failing to turn on its anchor lights at sunset and lower its anchor ball (Tr. 169).

In assessing the faults of both vessels, we find that the Tenadores, by its excessive speed when it entered the anchorage and by its inexcusable failure to have an adequate number of lookouts posted, was primarily at fault in causing the collision. The Clydebank, though to a lesser degree, contributed to the cause of the collision by its negligence. Consequently, we are constrained to and do apportion liability for the collision as follows: 70% is imputed to the plaintiff Empressa Hondurena de Vapores and 30% to defendants Bankline Limited and M/V Clydebank. See *Fathom Expeditions, Inc. v. M/T Gavrion,* 402 F.Supp. 390 (M.D.Fla. 1975). All the other points raised by both parties have been considered but are rejected as without merit. Parties to settle order on submission.

---

**5.** The pilot, Captain Warner, testified at the Canal Zone Investigation that only at 1800, with the Tenadores on a steady approaching bearing to Clydebank's port bow, did he put the

Clydebank back on dead slow and hard astarboard and blew one blast on the whistle. Later at 1802 he ordered stop engines and full astern and to let go the port anchor (C.Z. Invest. 6, 7).