## DALZELL v. THE NEW YORK.

## THE LLOYD H. DALZELL.

## THE CHRISTIAN HOLM.

No. 18068.

District Court, E. D. New York.

May 25, 1948.

Burlingham, Veeder, Clark & Hupper, of New York City (Eugene Underwood, of New York City, of counsel), for libellant.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for Tug New York.

J. Vincent Keogh, U.S. Atty., of Brooklyn (Leo J. Curren, of New York City, of counsel), for respondent-impleaded.

GALSTON, District Judge.

During the early morning of April 7, 1945, the tug Lloyd H. Dalzell was assisting the steamship Christian Holm, which was heading south in the East River, bound for anchorage off the Statute of Liberty. The tug was made fast to the port bow of the steamer and lay along her port side with her engines idle. It is the contention of the libellant that as the Christian Holm rounded Corlear's Hook and was proceeding about in mid-channel, a green side light and two white staff lights of the tug New York, eastbound, towing a barge alongside on each side, were seen by those in charge of the navigation of the Christian Holm. The libellant contends that the New York at that time was above Manhattan Bridge and closer to the New York shore than the Christian Holm and that although the vessels were on courses which would have enabled them to pass safely starboard to starboard, the New York sounded a one-blast signal. The Christian Holm responded with a similar signal, and she claims that she put her rudder hard right with her starboard engine full speed astern, sounded a three-blast signal, and at the same time ordered the Lloyd H. Dalzell to work her engines full speed ahead against the port bow of the Holm so as to swing the Holm to starboard in an attempt to accomplish the port to port passing called for by the New York.

A collision resulted between the Dalzell and the loaded barge Robinson on the port side of the New York.

Romano was the pilot on the Christian Holm. He also was the captain of the Lloyd Dalzell, and was acting as pilot pursuant to the terms of a towage contract which included a pilotage clause. Romano testified that the Christian Holm, when the New York and her barges were first seen by him, was slightly off the Brooklyn side of midstream. Romano fixed the point of collision at about 1,250 feet from the Manhattan shore. He testified that the New York had moved out toward the Brooklyn side 1,000 feet from the time that he first saw her to the time of collision. During this same time the Christian Holm had moved somewhat to the Brooklyn side of the middle of the channel, perhaps 200 or 300 feet. The place of collision he believed was between Piers 40 and 42 of the New York piers.

When he answered the New York's one-whistle signal he immediately reversed the engines of the Christian Holm. At the time of the collision the starboard engine was reversing and the port engine stopped.

In considering the movements of both vessels it is important to understand the affect of a flood tide in that particular area. A flotilla passing under the Manhattan Bridge on her way towards the Williamsburg Bridge would find that the tide sets to the Manhattan shore to some point above Pier

35. One difficulty with the testimony of Romano is that it would follow from his story that the New York, towing heavily loaded barges, and with the tide setting on her starboard side, moved to her starboard at least three times as far as did the Holm, which unencumbered was assisted by a tug. It is difficult to understand why the Christian Holm was not swung farther to her starboard, for there was sufficient depth in the channel. Some explanation is afforded from the admission of Romano that his vessel did not handle too well. This fact is important, for, of course, the New York had no means of knowing that such a difficulty existed after Romano had answered with a one-whistle signal. Romano admitted that had the Holm been over 100 feet further toward the Manhattan shore, the collision would have been avoided. She had the assistance of the Lloyd Dalzell, and after answering the New York's one-whistle signal with a one-whistle reply, not only did the Holm manipulate her own steering gear to change her heading, but she ordered the Lloyd Dalzell to push against her port bow. She was proceeding against the flood current of about two miles an hour. Visibility and wind were not factors involved in determining the cause of collision.

The speed of the New York was about six miles per hour, with a tide under foot. I am persuaded that the New York witnesses more accurately described the happening of the collision. Particularly is this true with respect to the initial position of the New York. If the New York had been in the position in which Romano testified he first observed her, it is not easy to understand why the New York should have given a signal calling for a port to port passing, for the flotillas then, according to him, were in position to pass starboard to starboard.

Moreover the record shows that the Christian Holm at the time was a hard-steering vessel. I am not disposed to accept the testimony of Romano as to the place of collision. The course of the New York was around Corlear's Hook and eastward in the East River, while the course of the Christian Holm was around Corlear's Hook and westward. The place of collision, as indicated by Law, the master of the New York, on New York Exhibit 2, is much more within the probabilities than that indicated by Romano. This appears to be at a point below Pier G of the Navy Yard.

The fault was, therefore, that of the Christian Holm, and I cannot find that fault may properly be ascribed to the New York. The libellant urges that the New York should have given an alarm signal, but how the giving of such a signal would have changed the maneuvering of the Christian Holm is difficult to understand.

Nor can any fault, of course, be ascribed to the tug Lloyd Dalzell. She was under orders from those in command of the Christian Holm. The pilotage clause of the towage contract imposed responsibility on the owner of the vessel which was assisted by the tug. That Romano was in the general employ of the libellant cannot relieve the impleaded respondent of liability; Moran Towing & Transportation Co., Inc. v. Navigazione Libera Triestina, S. A., 2 Cir., 92 F.2d 37; Sun Oil Co. v. Dalzell Towing Co., D.C., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 1277.

The libel against the tug New York and the Tug New York Company will be dismissed, but sustained as against the respondent-impleaded.

Concurrently with the filing of this opinion, appropriate findings of fact and conclusions of law will be filed.