## MATHIASEN SHIPPING CO., Inc. v. UNITED STATES.

### THE IDEAL.

### THE GOLDEN FLEECE.

No. 137–12.

United States District Court
S. D. New York.

Aug. 19, 1949.

Burlingham, Veeder, Clark & Hupper, New York City, for libelant. (A. Howard Neely and John L. Belford, New York City, advocates).

John F. X. McGohey, U. S. Atty., New York City, for respondent (Gilbert S. Fleischer, Sp. Atty., Dept. of Justice, New York City, advocate).

KENNEDY, District Judge.

Mathiasen Shipping Co. Inc. (referred to as Mathiasen) has filed its libel on in rem principles against the United States, as owner of the steamer Golden Fleece.[1] The suit is to recover damages for the loss of libelant's tug Ideal,[2] which on January 7, 1945, at about 2:00 p.m., Eastern War Time, was crushed against Pier 13, Staten Island, and which ultimately foundered somewhere to the southward of the pier. Shortly prior to January 6, 1945, Mathiasen had entered into an engagement with the Bull Line, agents for the owners of Golden Fleece, to undock the steamer, which had discharged its cargo at Pier 74, North River, and to place her at an in-shore berth on the north side of Pier 13, Staten Island. Libelant's tugs Evelyn[3] and Ideal picked up Golden Fleece and towed her down the bay. When the tugs and tow arrived off Pier 13 (about 10:00 a.m. January 6, 1945) the designated berth was not clear, for which reason Golden Fleece came to an anchor in the Bay Ridge anchorage. Evelyn's master, who was in charge of the operation, went ashore and explained the situation to his superiors by telephone.

1. Golden Fleece is 441.2 feet long, 63.2 feet beam, and depth 36.7 feet, 6000 horsepower. She was built in 1944 and displaces 8,258 gross tons.

2. Ideal is 86.5 feet long, 24.8 feet beam, depth 10.9 feet, 550 horsepower.

3. Evelyn is 90.5 feet long, 26 feet beam, and depth 11.6 feet, 750 horsepower.

It was snowing heavily. The tide was near the beginning of ebb, but the wind was from northeast with a force, at that time, of about 20 miles per hour. Evelyn's master was told that the tug Niagara[4] would be sent to assist him. When Niagara arrived, Evelyn's master was on the bridge of Golden Fleece, acting as docking pilot under the then existing United States uniform pilotage clause, which is in evidence and which, of course, makes the docking pilot ad hoc the servant of the ship.

At 1:20 p. m. Golden Fleece weighed anchor and, using her engines, shaped her course for the slip between Piers 13 and 12. Ideal was stationed on the port bow with Evelyn just astern of her; Niagara was on the port quarter. Moored along the north face of Pier 13, in the outer berth, was the liberty ship John Howland.[5] On the south side of Pier 12 there was another liberty ship whose beam was the same as John Howland's (57.1 feet). There was, however, ample clearance between the two moored ships for Golden Fleece to enter. But just before she did so, the wind had freshened and its force certainly exceeded 26 miles per hour. The tide, it will be remembered, was now at the beginning of ebb and was setting therefore in approximately the same direction as the wind. The result was that Golden Fleece began to sag down almost parallel with the center line of the slip. By the time 200 feet of the length of the steamer were inside the slip Evelyn had cast off and backed out into the stream. But Ideal was unable to complete the same maneuver, although she tried. The stern of John Howland was ahead of her (about 20 feet), forbidding a movement in a forward direction. While on station, Ideal's stem was about 75 feet abaft of that of Golden Fleece, and therefore when the crisis came, she was under the necessity of backing some 200 feet to get clear. She could not do this, and her port quarter was crushed against the north corner of Pier 13.

Thereafter three army tugs breasted Golden Fleece away from the pier and the John Howland, and got her into the slip without damage to herself, to the pier, or to the liberty ship. What remained of Ideal either floated or was towed a short distance down stream and sank—a constructive total loss.

On these facts, it would seem that the in rem liability of Golden Fleece could hardly be disputed. It is idle to talk about inscrutable fault under the conditions that existed, nor is there any great point in the contention made by respondent that Ideal assumed the risk. She took station where she was assigned by the docking master who concededly never relieved her. She is criticised because when she attempted to extricate herself she may have backed on left rudder.[6] Assuming she did, it would be no more than an error in extremis and would not amount to a fault, to say nothing about the question of proximate cause, for the real cause of the disaster was the persistence of the docking master in attempting to berth the ship when he realized, upon entering the slip, that he could not cope with the wind and tide. His only course then was to back; there was a safe anchorage quite close at hand. He took the risk of going ahead, a course of conduct which is chargeable to Golden Fleece.

But respondent, answering all this, argues that even under a pilotage clause the libelant towing company is responsible (or at least Golden Fleece is immune from liability), because (1) the docking operation was undertaken with inadequate power, which is the responsibility of libelant, and (2) even if that were not so, the pilotage clause cannot be used as a "sword" in-

4. Niagara is 95.5 feet long, beam 24.7 feet, depth 12.2 feet. She was built in 1918. Incidentally, there is in the record some dispute about whether Niagara's horsepower is 450 or 750. I do not believe that this controversy is very important: It seems clear to me that Niagara probably developed not much less than 750 horsepower; at any rate she was fit for the task she undertook.

5. John Howland is 423.1 feet long, depth 34.8 feet, and beam 57.1 feet.

6. Ideal's master testified to this effect at the coast guard inquiry; at the trial of this cause he said he could not remember putting his wheel over.

stead of a "shield": the ship cannot be held responsible for damage inflicted upon the property of libelant by its own negligent servant, namely, the docking master.

█ The trouble with the first contention is that it is based upon an hypothesis not only unsupported, but contradicted by all the evidence there is. Everyone concerned, including the master of Golden Fleece, was satisfied to commence the docking operation with the towage facilities at hand, and until the moment the steamer began to sag down, no witness in the case either foresaw or had grounds to foresee that this would happen. But, of course, after the unexpected sagging commenced, the question of towage power became irrelevant: at that point the docking master should have foreseen and avoided the disaster.[7]

█ The second contention urged by the respondent has been raised unsuccessfully at least once before, and recently in my own district, Dalzell v. The New York, D. C.1948, 77 F.Supp. 793. The fallacy underlying respondent's position is that it seeks to apply to a case of liability in rem the principles which would govern personal liability, and it ignores the effect of the pilotage clause. There was no reservation in the standard pilotage clause in effect at the time of this disaster under which the towage company waived any rights which a third party would have. And the effect of the pilotage clause is much the same as if, until the completion of the operation, the docking master had been discharged by the tower, and had entered the service of the tow.

For the rest, respondent cites a number of cases which set forth the familiar principle that fault is not, under ordinary circumstances, to be imputed to the tow. The answer is obvious: the circumstances here were not ordinary, because the tow was using her own engines, and, beside that, a pilotage clause, the validity of

which is no longer open to question, governed the relations between tug and tow. It would be ridiculous to say that a ship may be held responsible for its maneuvers while under the control of a compulsory pilot, The China, 1869, 7 Wall. 53, 19 L. Ed. 67, but that its responsibility disappears when by a proper contract she has voluntarily charged herself with the derelictions of a docking pilot.

The sole proximate cause of the disaster to Ideal lies in the fact that Golden Fleece, having become conscious of imminent danger unforeseen until she entered the slip, took the risk of continuing, and attempting the impossible: the disaster inevitably followed.

Libelant is entitled to an interlocutory decree in the usual form against respondent, with costs.

I have filed findings of fact and conclusions of law.

---

7. The mere fact that Golden Fleece safely crossed the lower bay to the slip entrance without incident (e. g. sagging), as all agree, to me shows (1) that the towage facilities were adequate, as the docking master thought, when the venture began, and (2) the sagging was caused by sudden gusts, or increased wind pressure at the slip.